UNITED STATES of America,
Plaintiff–Appellee,

v.

Franklin Delano FLOYD,
Defendant–Appellant.

No. 95–6305.

United States Court of Appeals,
Tenth Circuit.

April 18, 1996.

Susan M. Otto, Federal Public Defender, Oklahoma City, Oklahoma, for Defendant–Appellant.

Mark A. Yancey, Assistant U.S. Attorney (Patrick M. Ryan, United States Attorney, Edward J. Kumiega, Assistant U.S. Attorney, with him, on the brief), Oklahoma City, Oklahoma, for Plaintiff–Appellee.

Before BRORBY, McKAY, and ALARCÓN,* Circuit Judges.

ALARCÓN, Circuit Judge.

This case presents us with a novel issue: Is a stepparent, who earlier relinquished custody of the child to the state, following the death of its biological mother, exempt from

---

* Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting · by designation.

prosecution for kidnapping under 18 U.S.C. § 1201 because he is the victim's "parent" under 18 U.S.C. § 1201? We conclude that, while the ordinary meaning of the word "parent" includes a stepparent, or any person who voluntarily assumes a biological parent's responsibility to rear a child, a person who has terminated this status by freely relinquishing custody of the child to the state is no longer his or her "parent" under section 1201.

Following a bench trial, Franklin Delano Floyd ("Floyd") was convicted of kidnapping, carrying a firearm during the commission of a kidnapping, carjacking, carrying a firearm during the commission of a carjacking, felony possession of a firearm, and interstate transportation of a stolen vehicle.

Floyd seeks reversal on the following grounds:

One. He is exempt from prosecution for kidnapping pursuant to 18 U.S.C. § 1201 because he is the "parent" of the victim.

Two. The evidence is insufficient to support his conviction for kidnapping, interstate transportation of a stolen vehicle, and carrying a firearm during the commission of a kidnapping and carjacking.

Three. The count of carrying a firearm during the commission of a kidnapping is duplicative of the charge of carrying a firearm during the commission of a carjacking.

Four. He was denied his right to self-representation.

Five. He was denied his right to trial by jury because the court refused his request that the jury be sequestered.

We affirm because none of these contentions is meritorious.

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. After setting forth the pertinent facts, we will address the merits of each of Floyd's contentions under separate headings.

## I

## PERTINENT FACTS

In February, 1973, Floyd was arrested by the Atlanta Police Department for attempted kidnapping. At that time, he was on parole after serving time in a federal prison for bank robbery. Floyd failed to appear for trial. Federal authorities issued a warrant for his arrest as a parole violator.

Shortly after he became a fugitive, Floyd developed a relationship with Linda Williams. When they met, Linda Williams had a daughter named Sharon. In 1974, Floyd took Sharon with him after Linda Williams refused to marry him. During Sharon's childhood, Floyd and Sharon lived together as father and daughter in several states. Floyd used a variety of aliases to avoid arrest on the outstanding warrant.

In 1987, while Floyd and Sharon were residing in Phoenix, Arizona, Sharon began dating Gregory Higgs. As a result of her relationship with Gregory Higgs, Sharon became pregnant. Sharon did not inform Higgs that she was pregnant. Floyd and Sharon left Phoenix before the baby was born. On April 21, 1988, Sharon gave birth to a male child in Tampa, Florida. She named him Michael Gregory Marshall.

When Michael was 14 months old, Floyd and Sharon were married in New Orleans, Louisiana on June 15, 1989. They used the names Clarence Marcus Hughes and Tonya Dawn Tadlock on their marriage license documents. Floyd later told government investigators that it was a marriage of convenience designed to provide Michael with a father. Floyd also told the officers that the marriage was never consummated. Following their marriage, Floyd and Sharon moved to Tulsa, Oklahoma.

Sharon was killed in a hit-and-run automobile accident in April 1990. A few days later, Floyd voluntarily relinquished custody of Michael to the Oklahoma Department of Human Services. Michael was placed in a foster home in the early part of May 1990. In June 1990, Floyd was arrested as an alleged federal parole violator.

After Sharon's death, Floyd called Gregory Higgs and informed him of her demise. Higgs testified that Floyd told him that Sharon had given birth to Michael, and that Higgs was the child's biological father. Floyd asked Higgs if he wanted to raise

Michael. He invited Higgs to think it over. A day or two later, Floyd telephoned Higgs. Higgs informed Floyd that he wanted to raise Michael. Floyd promised to contact Higgs within a month to deliver Michael to him. Floyd did not communicate with Higgs again.

On May 17, 1990, the State of Oklahoma filed a petition in the District Court for Oklahoma County to make Michael a ward of the court as a "deprived child." During these proceedings, Floyd claimed he was Michael's biological father. He requested that the court enter an order preserving his parental rights. Pursuant to Floyd's false representations that he was Michael's biological father, the state trial court ordered Floyd to pay child support and granted him the right to have Michael brought to the prison for supervised visits. The court also ordered that blood tests be administered to determine whether Floyd was Michael's biological father.

In December 1992, the state trial court ruled, without conducting an evidentiary hearing, that the blood tests demonstrated that Floyd was not Michael's biological father. The court further ordered that all contact between Floyd and Michael be terminated. Floyd appealed from this decision, asserting that he was entitled to an evidentiary hearing and the right to cross-examine the state's expert witnesses. In an opinion published on July 6, 1993, the Oklahoma Supreme Court agreed and remanded the matter for an evidentiary hearing on the blood test results. See Matter of M.A.H., 855 P.2d 1066 (Okla.1993). On July 12, 1994 the state trial court scheduled an evidentiary hearing for September 23, 1994.

On the morning of September 12, 1994, Floyd drove to the Indian Meridian Elementary School in Choctaw, Oklahoma, where Michael's foster parents had enrolled him. Floyd ordered the school principal, James Davis, to help him kidnap Michael. Davis testified that Floyd said, "I'm ready to die, and if you don't help me, you won't live." Floyd informed Davis that he had a gun and

displayed a portion of the pistol concealed in his pants pocket. Floyd instructed Davis to remove Michael from his class and to take him to Davis's 1994 Ford pickup truck.[1] Floyd then directed Davis to drive to a secluded, wooded location. There, Floyd told Davis to get out of his truck. Michael remained inside the truck. Floyd handcuffed Davis's hands together behind a tree and taped his mouth shut with three layers of duct tape. Davis testified that, while he was being handcuffed, Floyd completely removed the pistol from his pocket and that he had fifteen to twenty seconds to observe it at close range. After asking Davis for instructions on how to start the truck, which Davis demonstrated through non-verbal communication, Floyd left the scene. Because Davis was handcuffed facing away from the truck and Floyd had removed Davis's hearing aid, Davis did not actually see or hear Floyd drive off in the truck. Davis was rescued four and one-half hours later.

On September 23, 1994, the state trial court held an evidentiary hearing as mandated by the Oklahoma Supreme Court. Floyd's counsel attended the hearing. After hearing evidence, the state trial court found that Floyd was not Michael's biological father.

On November 10, 1994, Floyd was arrested and taken into custody by FBI agents in Louisville, Kentucky. Michael was not with him. Michael has not been located to this date. After his arrest, Floyd offered to reveal Michael's whereabouts in exchange for a written agreement that he not be prosecuted.

On January 18, 1995, a grand jury indicted Floyd for the kidnapping of Michael in violation of 18 U.S.C. § 1201, the carrying of a firearm during the kidnapping in violation of 18 U.S.C. § 924(c)(1), the carjacking of Davis's truck in violation of 18 U.S.C. § 2119, a second violation of § 924(c)(1) for carrying a firearm during the carjacking, the felony possession of a firearm in violation of 18 U.S.C. § 922(g)(1), the interstate transportation of a stolen vehicle in violation of 18

---

1. Before entering the school, Floyd abandoned his own pickup truck about 200 yards from the school.

U.S.C. § 2312, and the taking of a hostage in violation of 18 U.S.C. § 1203.

Prior to trial, the district court granted Floyd's motion to dismiss the hostage charge. Floyd also filed a pretrial request styled as a "Motion to Proceed in Propria Persona" in which he sought to represent himself at trial. Prior to trial, however, Floyd informed that court that he did not want to "take over his own representation." Instead he requested that he be allowed to offer "argument" on the parental kidnapping exemption and agreed that his counsel, Susan M. Otto, would represent him on all other aspects of the case. The district court granted Floyd's request and, in a subsequent hearing, set the "ground rules" for Floyd's participation in cross-examining witnesses. Floyd also made a pretrial motion to sequester the jury. The court denied this motion. Floyd then signed a waiver of his right to a jury trial.

At the conclusion of the bench trial, the district court convicted Floyd on each of the remaining six counts and sentenced him to serve 627 months in prison.

## II

## DISCUSSION

### A. *Surrogate Parenthood*

Floyd first challenges his conviction for kidnapping in violation of 18 U.S.C. § 1201. At the time of the kidnapping, section 1201 provided in relevant part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, *except in the case of a minor by the parent thereof,* when—
>
> (1) the person is willfully transported in interstate or foreign commerce . . .
>
> shall be punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201(a)(1) (1988) (emphasis added).

During pretrial proceedings, and at trial, Floyd argued that he was exempt from the application of section 1201 because he is Michael's parent. The district court determined that Floyd was not Michael's biological father. The court also ruled, however, that the term "parent," as used in section 1201, can include a "single stepparent." The district court concluded that Floyd had not demonstrated that he was performing the "incidences" of parenthood at the time of the kidnapping.[2] Accordingly, the district court ruled that Floyd could be convicted for kidnapping Michael.

▮▮▮ Floyd does not challenge the district court's finding that he is not Michael's biological father. Instead, Floyd argues that he comes within the exemption set forth in section 1201 because he "acted as Michael's male parenting figure prior to the death of the child's mother." Alternately, Floyd argues that the district court erred in finding that he was not Michael's father at the time of the kidnapping because, even after voluntarily relinquishing Michael to the State of Oklahoma, Floyd "continued to exercise the [parental] rights available to him." We review *de novo* the district court's interpretation of section 1201. *See United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir. 1990) (statutory interpretation is subject to *de novo* review), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). We review the district court's findings of fact for clear error. *Brecheen v. Reynolds,* 41 F.3d 1343, 1366 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995).

### 1. *Interpretation of the Word "Parent"*

In resolving the question whether Floyd is exempt from prosecution for kidnapping, we

---

**2.** The district court held that there were five "incidences" of parenthood:

One, that he directly provide a home for the child. Two, that he commit to providing directly all the other necessities for the child. Three, that he be himself and personally entitled to the services of the child in household chores and the like. Four, that he assume

direct responsibility for the training and discipline of the child as he, the stepparent, sees fit in the exercise of his reasonable discretion. And five, that he be empowered to select for the child the child's residence, school, church, other institutions of associations and the child's personal associations.

must first determine whether the word "parent," as used in section 1201, includes a person who is not a biological parent. Floyd does not argue that the record demonstrates that he is Michael's biological father. Thus, if the statutory exemption is limited to biological parents, Floyd cannot prevail on this issue.

■ Congress did not define the word "parent" in section 1201. In interpreting Congressional intent, a reviewing court must determine whether the language used in a statute is ambiguous, or whether it has an ordinary meaning. *See Chapman v. United States,* 500 U.S. 453, 461–62, 111 S.Ct. 1919, 1925, 114 L.Ed.2d 524 (1991) (if statutory language has not been defined and does not have "any established common-law meaning" the terms of the statute "must be given their ordinary meaning"). "If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

We are persuaded, after consulting the dictionary, that the word "parent" is not ambiguous. *The Oxford English Dictionary,* Vol. VII at 222 (2nd ed. 1989) defines "parent" as both "[a] person who has begotten or borne a child; a father or mother" and "[a] person who holds the position or exercises the functions of a parent; a protector, guardian." Similarly, *Webster's Third New International Dictionary* at 1641 (4th ed. 1976) defines "parent" as "one that begets or brings forth offspring" and "a person standing *in loco parentis* although not a natural parent." *Accord, Black's Law Dictionary* at 1114 (6th ed. 1990) ("In common and ordinary usage [parent] comprehends much more than mere fact of who was responsible for child's conception and birth and is commonly understood to describe and refer to a person or persons who share mutual love and affection with a child and who supply child support and maintenance, instruction, discipline, and guidance") (citing *Solberg v. Metropoli-*

*tan Life Ins. Co.,* 50 Wis.2d 746, 185 N.W.2d 319, 323 (1971)).

■ There is only one reported opinion that has discussed the question whether the exemption in section 1201 can apply to a person who is not a biological parent. In *Miller v. United States,* 123 F.2d 715 (8th Cir.1941), *rev'd on other grounds,* 317 U.S. 192, 63 S.Ct. 187, 87 L.Ed. 179 (1942), the appellant claimed that he was exempt from prosecution for kidnapping his married stepdaughter. *Id.* at 717. The Eighth Circuit reasoned that, "[t]he term 'parent' primarily means one who begets a child.... However, it is also well recognized that the term 'parent' in a broad sense and under certain circumstances may include anyone who stands in a position equivalent to that of a parent." *Id.* at 717. The court concluded that the appellant was not exempt from prosecution because, at the time of the kidnapping, he was like "an utter stranger to this minor" and "had never accepted any of the duties and liabilities ... of one who stood in loco parentis." *Id.* at 717–18. The defendant could not, therefore, satisfy even "the broadest and most latitudinarian definition ... of the term 'parent'." *Id.* We agree with the Eighth Circuit that a person who stands in the place of a biological parent at the time of a kidnapping is exempt from prosecution pursuant to section 1201.

■ Our conclusion that a surrogate parent is exempt from prosecution under section 1201 does not contravene Congress' intent in creating the "parent" exception to section 1201. In deciding whether the words "or otherwise" that follow "held for ransom and reward" in section 1201 require proof of an intent to obtain money or something of value, the Supreme Court reasoned as follows in *Gooch v. United States,* 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522 (1936):

> [t]he words 'except, in case of a minor, by a parent thereof' emphasize the intended result of the enactment. They indicate legislative understanding that in their absence a parent, who carried his child away because of affection, might subject himself to condemnation of the statute.

*Id.* at 129, 56 S.Ct. at 397. We are persuaded that a surrogate parent, who has not voluntarily abandoned the responsibilities of a biological parent prior to the time he or she carries a child away, is not subject to prosecution under the statute.

### 2. *The Status of a Surrogate Parent May Be Temporary.*

 Floyd contends that the district court erred in concluding that his status as a stepparent terminated when he voluntarily relinquished custody of Michael to the state shortly after Sharon's death. Floyd asserts that he "exercised all the care and the custodial indicia of parenthood identified by the district court until the death of Michael's mother."

 A person acting *in loco parentis* is one who acts "in the place of a parent." *Webster's Third New International Dictionary on the English Language* at 1165 (4th ed. 1976). A person who acts *in loco parentis* voluntarily performs all of the duties a parent normally provides to his or her child. *See Leyerly v. United States,* 162 F.2d 79, 85 (10th Cir.1947) (a person acting *in loco parentis* is "charged fictitiously with a parent's rights, duties and responsibilities"); *Griego v. Hogan,* 71 N.M. 280, 377 P.2d 953, 955–56 (1963) (a person acting *in loco parentis* "undertakes the care and control of another in the absence of such supervision by the latter's natural parents and in the absence of formal legal approval"); *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879, 881–82 (1977) (a person acting *in loco parentis* "put[s] himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formalities of adoption"). Parental status based on *in loco parentis* status is thus, by its very nature, a temporary status. *Black's Law Dictionary* at 787 (6th ed. 1990) (citing *Griego,* 377 P.2d at 955). It is created when a person undertakes the care of a child. It ends when a person voluntarily ceases to fulfill this responsibility. Because *in loco parentis* status is temporary and voluntary, to apply the parent exception to a person

who kidnapped a child, we must consider whether such a person continued to fulfill the responsibilities of a parent at the time of the kidnapping. *Accord Miller,* 123 F.2d at 717 (determining parental status "at the time of the kidnapping"). These duties include bestowing upon the child love, affection, support, maintenance, instruction, discipline, and guidance.

Floyd appears to argue that, because he acted as Michael's male parent in the place of his biological father from the date of the child's birth until his custody was voluntarily relinquished to the Oklahoma Department of Human Services, he is exempt from prosecution under section 1201. This argument confuses the distinction between a biological parent and a surrogate parent.

A man or woman who begets a child remains his or her biological parent forever. A surrogate parent who has not adopted the child may terminate his or her parental relationship to the child by freely relinquishing custody to the state or to another person. Once the responsibilities of surrogate parenthood are abandoned, the interim status of parenthood ends.[3]

Here, Floyd voluntarily relinquished custody of Michael to the Oklahoma Department of Human Services. After that, he ceased to act in place of Michael's biological parents. That responsibility was assumed by the state and Michael's foster parents. The district court did not err in determining that Floyd was not exempt from prosecution for kidnapping Michael because he was not his surrogate parent on the date of the kidnapping.

Floyd also contends that because he paid child support as ordered by the state trial court, and because he exercised his right to have Michael brought to the prison to visit him, he thus continued to serve as Michael's parent after he relinquished custody of Michael to the state. This argument is unpersuasive. The record shows that at the time Floyd paid the court-ordered child support, and insisted that Michael be brought to the prison, he had falsely represented to the state trial court that he was Michael's biolog-

---

**3.** We do not express any opinion as to whether an involuntary relinquishment of a child would terminate one's surrogate parent status for purposes of 18 U.S.C. § 1201(a).

ical father. Floyd apparently perpetrated this fraud in order to regain custody of Michael upon Floyd's release from prison. This fraudulent conduct does not demonstrate that Floyd continued to perform the duties of a surrogate parent after he relinquished custody of the child to the state. It shows, instead, that he was attempting to deceive the court into awarding him custody of Michael solely because he falsely claimed to be the child's biological father.

By surrendering the child to the Oklahoma Department of Human Services, Floyd demonstrated his recognition that as a fugitive from justice, he was not in a position to fulfill all the responsibilities owed to a child by someone acting in the place of a biological parent. Floyd's refusal to return Michael to Oklahoma unless state and federal authorities agreed not to file any criminal charges against him, eloquently confirms the fact that he has treated Michael as a helpless pawn, instead of as a child in need of the protection and love of responsible surrogate parents. The district court did not err in holding that Floyd was not exempt from prosecution for kidnapping Michael.

**B. *Sufficiency of the Evidence***

At the close of the Government's case, and again at the close of evidence, Floyd moved for a judgment of acquittal on the charges of kidnapping, interstate transportation of a stolen vehicle, carrying of a firearm during the commission of a kidnapping, and carrying of a firearm during the commission of a carjacking, on the ground that the Government failed to introduce sufficient evidence to support conviction of these charges. The district court denied the motions.

■■■■ We review *de novo* the sufficiency of the evidence. *United States v. Williamson,* 53 F.3d 1500, 1514 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995). We must inquire "whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (citations and internal quotation marks omitted).

**1. *Kidnapping***

■■■■ In order to prove that Floyd kidnapped Michael in violation of 18 U.S.C. § 1201(a), the Government was required to establish beyond a reasonable doubt that Michael was "wilfully transported in interstate or foreign commerce" by Floyd. *See* 18 U.S.C. § 1201(a)(1). Floyd claims that the Government failed to demonstrate that he took Michael outside of Oklahoma. We disagree.

The evidence introduced at trial demonstrates that on September 12, 1994, Floyd abducted Michael from his elementary school in Choctaw, Oklahoma. James Davis testified that Floyd used Davis's pickup truck to transport Michael from the school. Davis's pickup truck was next found in a Wonderbread parking lot in Dallas, Texas. Evidence was introduced that in October, 1994, Floyd was employed by a painting contractor in Louisville, Kentucky. One of Floyd's coworkers testified that Floyd confessed to him that he had abducted a five-year-old boy and that the boy had been with him in Atlanta, Georgia. Floyd's confession that he took Michael to Atlanta is corroborated by the fact that a partial map of Atlanta was found in Floyd's abandoned truck. A second map of Atlanta was found in Floyd's possession at the time of his arrest.

The district court's finding that Floyd transported Michael outside of Oklahoma is further supported by Floyd's admissions to federal investigators. An FBI agent testified that Floyd admitted that he left Oklahoma on September 12, 1994 and went to Kansas City, Missouri, then to Dallas, Texas, then to Atlanta, Georgia, and finally to Louisville, Kentucky. Floyd also told investigators that they might locate Michael by running advertisements in various foreign countries. Floyd further represented to investigators that if charges against him were dropped, he would arrange "the safe return of Michael to Oklahoma." We can infer from this incriminating statement that Floyd transported Michael outside of Oklahoma.

Viewed in the light most favorable to the Government, the evidence is sufficient to pro-

vide the district court with a reasonable basis for concluding, beyond a reasonable doubt, that Floyd transported Michael outside of Oklahoma.

### 2. Interstate Transportation of a Stolen Vehicle

Floyd next contends that the Government failed to demonstrate that he transported Davis's truck outside of Oklahoma in violation of 18 U.S.C. § 2312.[4] We conclude that this contention is also without merit.

At trial, the Government established that Floyd carjacked Davis's pickup truck in Choctaw, Oklahoma on September 12, 1994. A police officer testified that the pickup truck was found in mid-October 1994 in a Wonderbread parking lot in Dallas, Texas. A Wonderbread employee testified that the truck was unlocked, undamaged and contained valuables, including a radio and Davis's toolbox. A police officer testified that it was highly unusual to find a stolen vehicle in such good condition. In addition, Floyd admitted to federal investigators that after he left Oklahoma on September 12, 1994, he went to Dallas, Texas. From this evidence, the district court could have reasonably concluded that Davis's truck was driven to Dallas by Floyd.

### 3. Violations of Section 924(c)

In his final challenge to the sufficiency of the evidence, Floyd argues that his convictions under 18 U.S.C. § 924(c) must be reversed because the Government failed to establish that Floyd possessed a firearm during the commission of the kidnapping and the carjacking. Floyd asserts the evidence is insufficient because "[t]he evidence adduced on each of these charges came from one witness, Mr. James Davis" and because "[n]o weapons were recovered from Mr. Floyd."

Credible witness testimony is sufficient to establish that a defendant possessed a firearm during the commission of a crime. See United States v. Gregg, 803 F.2d 568, 571–72 (10th Cir.1986) (upholding conviction

under 18 U.S.C. § 1202(a) where witnesses to bank robbery testified that the defendant used "a real gun, and not a toy gun" and were able to describe the weapon), cert. denied, 480 U.S. 920, 107 S.Ct. 1379, 94 L.Ed.2d 693 (1987); United States v. Hamilton, 992 F.2d 1126, 1130–31 (10th Cir.1993) (upholding a conviction under 18 U.S.C. § 924(c) where defendant's confession was corroborated by witness testimony that the defendant carried "a real gun which she knew was real because it sounded heavy and made of metal when he laid it on the counter"). The Government is not required to introduce the actual firearm into evidence. Gregg, 803 F.2d at 571.

Here, Davis testified that when Floyd demanded his help in abducting Michael, Floyd informed him, "I think I should tell you I have a gun." Davis testified that Floyd showed him the handle of the gun. Davis further testified that when Floyd handcuffed him to a tree, he had fifteen to twenty seconds to observe the gun from approximately three feet away. Davis, who himself owns two rifles and two shotguns, stated that the gun "was a small pistol, chrome-plated, a squared-off barrel with a muzzle protruding maybe a quarter, three-eights inches from the main barrel." Davis testified that after examining weapons in a gun store, he concluded that the gun used by Floyd was a Raven .25 semiautomatic pistol. The district court did not err in determining that Davis's testimony was sufficient to establish beyond a reasonable doubt that Floyd possessed a gun during the course of the kidnapping and the carjacking.

### C. Consecutive Sentences for Section 924(c) Violations

Floyd argues that the district court erred in imposing consecutive sentences for violation of 18 U.S.C. § 924(c) because the count of possession of a firearm during the commission of the kidnapping is duplicative of the count of possession of a firearm during the commission of the carjacking. Floyd contends that these counts are duplicative

---

**4.** 18 U.S.C. § 2312 provides:
Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both.

because the carjacking and kidnapping were "a single, continuous event."

" 'We have held that consecutive sentences may be imposed for multiple 924(c) counts if the offenses underlying each 924(c) count do not constitute a single offense for double jeopardy purposes.' " *United States v. Callwood,* 66 F.3d 1110, 1114 (10th Cir. 1995) (quoting *United States v. Sturmoski,* 971 F.2d 452, 461 (10th Cir.1992)). Separate crimes do not become a single offense merely because they "arise out of the same criminal episode" or because "the same gun is paired with each underlying offense." *Id.* Instead, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

Here, the indictment alleged two violations of section 924(c) based on the underlying offenses of kidnapping in violation of 18 U.S.C. § 1201(a) and carjacking in violation of 18 U.S.C. § 2119. It is undisputed that sections 1201(a) and 2119 are directed at different types of conduct (i.e. abduction of a child versus taking a vehicle from another by force and violence) and require proof of different elements. Thus, the district court did not err in determining that the count for carrying a firearm during the commission of a kidnapping was not duplicative of the count for carrying a firearm during the commission of a carjacking. *See Callwood,* 66 F.3d at 1114 (holding that three consecutive prison terms for violation of section 924(c) may be imposed for three separate drug trafficking offenses); *Sturmoski,* 971 F.2d at 460–62 (upholding multiple section 924(c) counts based on the underlying offenses of maintaining a place to manufacture a controlled substance in violation of 21 U.S.C. § 856 and attempting to manufacture a controlled substance in violation of 21 U.S.C. § 846).

### D. *Self-Representation*

Floyd claims that he was denied his right to self-representation because the court "restricted his participation to a single issue: the parental exception to the federal kidnapping statute." Whether the actions of a district court violated a defendant's right to self-representation is reviewed for abuse of discretion. *Callwood,* 66 F.3d at 1113.

"Under the Sixth Amendment, a criminal defendant has a constitutional right to waive counsel and represent [himself or] herself." *Id.* (citing *Faretta v. California,* 422 U.S. 806, 834–36, 95 S.Ct. 2525, 2540–41, 45 L.Ed.2d 562 (1975)). In order to exercise this right, however, a defendant must "clearly and unequivocally" assert his or her intention to represent himself or herself. *Id.* (citing *United States v. McKinley,* 58 F.3d 1475, 1480 (10th Cir.1995)).

Here, Floyd filed a "Motion to Proceed In Propria Persona" in which he requested self-representation. At a subsequent hearing, however, Floyd's counsel represented to the district court that:

> Mr. Floyd is interested in presenting a particular aspect of this case to the Court. He is interested in presenting his position with regard to our challenge to Count One. It's my understanding, after discussing this with Mr. Floyd, that ... *he doesn't want to take over his own representation* with regard to the challenge to Section 1201.... (emphasis added).

The district court then asked Floyd whether he intended "that Ms. Otto would conduct the proceedings as your counsel, and then when we proceed to trial ... that Ms. Otto would actually act as counsel at trial." Floyd responded,

> Your Honor, that's fairly stated....
>
> My position is ... I need to make this statement ... to the 1201 exemption.... Therefore, after you have received that statement and it's on the record, I have no interest in your other motions....
>
> I'm fixing to go out of it once you allow my 1201 statement.

Floyd's statements to the district court constitute an abandonment of his motion to represent himself. Immediately prior to trial, Floyd requested permission for "quasi-hybrid representation" in which he could "participate in an active role in his trial." The district court granted his request and,

after setting forth some "ground rules,"[5] allowed Floyd to cross-examine witnesses and give a portion of the closing argument. The record does not reflect either that Floyd renewed his motion for self-representation or objected to the parameters of the "quasi-hybrid representation" set forth by the district court. We conclude that Floyd did not unequivocally request self-representation. Floyd's request for "quasi-hybrid representation" was granted by the district court. Floyd's contention is therefore frivolous.

### E. *Jury Sequestration*

 Finally, Floyd contends that the district court violated his right to a fair trial by refusing to grant his motion for jury sequestration. The decision to sequester "is left to the sound discretion of the trial judge." *United States v. Hall,* 536 F.2d 313, 326 (10th Cir.) *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976). On appeal, the defendant must demonstrate that the district court's failure to sequester the jury resulted in actual prejudice to his or her right to a fair trial. *Id.* at 326–27 (upholding denial of motion to sequester where, except for one non-prejudicial incident, the record did not indicate "that the jurors had been exposed to outside influences during the trial"); *United States v. Greschner,* 802 F.2d 373, 380–81 (10th Cir.1986) (failure to sequester jury did not violate defendant's right to a fair trial where publicity during trial "created little danger of prejudice"), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). There is nothing in the record to indicate that the district court's denial of the motion to sequester actually prejudiced Floyd's right to a fair trial. Accordingly, the district court did not abuse its discretion in denying the motion to sequester the jury.

AFFIRMED.

---

**5.** The district court required Floyd's counsel to commence cross-examination. Floyd was then allowed to ask follow-up questions on "remaining issues of interest" not covered by his counsel. Floyd was also cautioned about using cross-examination to make speeches.