**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 06-2072 |
| | (D. N.M.) |
| EDUARDO ATAYDE CHAVEZ, | (D.Ct. No. CR-04-1313 RB) |
| Defendant - Appellant. | |

_____

**ORDER AND JUDGMENT**[*]

Before **KELLY**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge and
**O'BRIEN**, Circuit Judge.

Eduardo Atayde Chavez was convicted by a jury of conspiracy to distribute

fifty grams and more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(A) & 846.  He claims the evidence was insufficient to support his

conviction and the court erred in giving a jury instruction on deliberate ignorance.

We affirm.

_____

[*] This order and judgment is not binding precedent.  10th Cir. R. 32.1(A).
Citation to orders and judgments is not prohibited.  Fed. R. App. 32.1.  But it is
discouraged, except when related to law of the case, issue preclusion or claim preclusion.
Any citation to an order and judgment must be accompanied by an appropriate
parenthetical notation -- (unpublished).  10th Cir. R. 32.1(A).

# I. BACKGROUND

This case arises from an extensive investigation into a large-scale methamphetamine trafficking organization headed by Guadalupe "Lupe" Lopez, a resident of Mexico. The government presented the testimony of a confidential informant, Aldo Rayos, and an undercover officer, Joe Terrazas. Rayos and Terrazas received over four pounds of methamphetamine from Lopez via a courier, Frank Gomez, on December 4, 2003. Lopez charged $7,000 per pound so Rayos and Terrazas owed $28,000. They paid $7,500 to Gomez and awaited further instructions from Lopez regarding the remaining payment.

In January 2004, Lopez asked Rayos and Terrazas to bring $10,000 to Juarez, Mexico. The agents advised Rayos it was not prudent to travel to Mexico so Rayos asked Lopez if he could make the payment to Gomez in El Paso. Lopez did not want Gomez to receive the money because "Gomez was just a delivery guy, and [Lopez] always had just family or close friends of his . . . pick up money." (Appellant's App., Vol. I at 73.) Mike Murphy, a special agent with the Drug Enforcement Administration whom the trial court recognized as an expert in methods of drug trafficking in general and the Lopez organization in particular, testified:

> [W]hat we found specifically with Guadalupe Lopez is, when it comes to the money, it's usually somebody that's family . . . or closely related; somebody that he can trust; somebody that he knows well or he knows their relatives where there's some sort of control, and he knows he can trust they're actually going to do what he wants

them to do and they're not going to steal the money on the way back.

(Appellant's App., Vol. II at 10.)

Lopez called Rayos and said he could make the payment to Chavez in El Paso: "Call this number and this will be the guy that's picking it up, and everything will be cool." (Appellant's App., Vol. I at 71.) Rayos called Chavez and they agreed to meet in a mall parking lot. On January 13, 2004, Chavez arrived at the parking lot in a Saturn with New Mexico license plates registered to a Honda.[1] Rayos and Terrazas got into the backseat of the Saturn. There was a child seat in the front passenger seat.[2] Rayos described the events that ensued as follows:

> [Chavez] asked us where we was from, you know, and how long it took us to get there. And then he told us he lived close by there, you know, and we gave him the $10,000. He was sent over there by his brother-in-law [Angel Martinez], and we just made it clear that it was—you know, the money was going to be taken to [Lopez], you know. And he told us, yeah, that was his brother-in-law that sent him, but we talked to Lupe Lopez, you know, and he ended up saying that they're brother-in-laws; they're all family anyway. So he was going to pick up his little boy and go back to Juarez and take him the money.

(*Id.* at 72.)

Terrazas testified he "handed [Chavez] the $10,000 . . . and [he] told him,

---

[1] One of the police officers conducting surveillance at the parking lot testified Chavez had false plates "to avoid detection for some reason." (Appellant's App., Vol. I at 155.) He explained: "It's not uncommon for people that drug traffic or get money to try to disguise their identity." (*Id.*)

[2] Chavez testified there was no child seat in the car.

"*Here, son diez . . . .*" (*Id.* at 117-18.) Chavez responded, "*Okay, son diez.*"[3] (*Id.* at 118.) The money was wrapped in newspaper and black electrical tape. The package was the length and width of a dollar bill and about "3 ½ to 4 inches" thick. (*Id.* at 125.) Chavez did not ask any questions about the money; nor did he unwrap or count it. Chavez said he was going to take the money to Lopez in Juarez. He said he was going to take his vehicle over the border but first he was going to pick up his son and motioned to where the car seat was "like . . . he was going to put the kid there . . . and the money in that area." (*Id.* at 119.) Terrazas testified he had previously seen people use children to try to deflect attention from their activities.

Chavez asked for Rayos' phone number so he could set up the next transaction. Chavez also asked Rayos and Terrazas to follow him to his house so they would know where it was which would "make it a lot easier for the next time, the next payment." (*Id.* at 80-81.) Rayos testified he "told [Chavez] we had another payment to make the following week." (*Id.* at 81.) Terrazas testified "[Chavez] stated that we could go to his house the next week when we were going to bring the other $10,000."[4] (*Id.* at 120.)

---

[3] Rayos testified "we always used some kind of code word." (Appellant's App., Vol. I at 66.) For example, "[a] dollar would be $1,000 to [Lopez]." (*Id.* at 75.) Terrazas testified in his experience drug dealers "talk in code" because "they're paranoid or they just don't like to talk out in the open." (*Id.* at 104.)

[4] Many of the telephone conversations as well as the meeting in the parking lot were recorded. The jurors received copies of the transcripts (including translations from Spanish to English) and listened to the tape recordings.

Manuel Marquez, a deputy sheriff patrolman, stopped Chavez approximately two months later to determine his identity. At the time he was stopped, Chavez was driving a Ford Crown Victoria with the same license plates he had on the Saturn (which were registered to a Honda). Chavez stated the plates belonged to his wife's vehicle.[5]

Not surprisingly, Chavez presented a somewhat different version of the events. Chavez testified he did not know Lopez. Chavez's sister was dating Lopez's ex-brother-in-law, Angel Martinez, who worked with Lopez. Chavez's sister claimed Martinez called her and asked her to pick up some money for him. Because she was busy preparing for her baby shower (she was pregnant with Martinez's child), she suggested Martinez call Chavez. Chavez claims Martinez called and asked him to pick up a $10,000 down payment for a ranch he sold in New Mexico. Chavez agreed to do so. He claimed he was not paid for his role in the transaction and did not know the money he received represented drug proceeds.

Special Agent Murphy testified he "ha[d] yet to find anybody [who had picked up money for Lopez] that doesn't know when they're involved in a drug deal." (Appellant's App., Vol. II at 12.)

The jury found Chavez guilty of conspiracy to distribute fifty grams and

---

[5] At trial, Chavez admitted he lied to the police officer about the origin of the plates.

more of methamphetamine. The court sentenced him to 120 months imprisonment.

## II. DISCUSSION

Chavez claims the government's evidence was insufficient to support his conviction and the court erred in instructing the jury on deliberate ignorance.

A. <u>Sufficiency of the Evidence</u>

"We review *de novo* the sufficiency of the evidence." *United States v. Floyd*, 81 F.3d 1517, 1525 (10th Cir. 1996). "We must inquire whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted). "To establish a conspiracy, the government was required to show (1) that two or more persons agreed to violate the law, (2) that [Chavez] knew at least the essential objectives of the conspiracy, (3) that [Chavez] knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007) (quotations omitted), *cert. denied*, 129 S. Ct. 1391 (2009).

Chavez contends the evidence was insufficient to prove the second and third elements. He claims "mere association with conspirators does not support a conspiracy conviction." (Appellant's Br. at 23.) Chavez is correct as to his

statement of the law, but viewing the evidence in the light most favorable to the government, there was more than "mere association" here. "Because conspiracies are, by definition, secretive, elements of the crime are often established through circumstantial evidence." *United States v. Dunmire*, 403 F.3d 722, 724 (10th Cir. 2005). Here, the circumstantial evidence supports the inference that Chavez knew the essential objectives of the conspiracy and knowingly and voluntarily became a part of it.

The jury could reasonably have found Chavez knew he was receiving drug money from Rayos and Terrazas because Chavez appeared to know Lopez, his sister was dating Lopez' ex-brother-in-law, and Lopez only used close friends and relatives to pick up drug money. When Rayos called Chavez to arrange the transaction, they agreed to meet in a parking lot. The jury could have found they chose a parking lot as opposed to a more public location—and conducted the transaction inside Chavez's vehicle—because they all knew the transaction involved drug money. Moreover, Chavez drove to the parking lot in a vehicle with false license plates. The jury could have found he used the false plates to avoid detection.

The jury could have found that when Terrazas told Chavez "son diez," Chavez knew he was referring to $10,000 because he knew the Lopez organization's terminology. (Appellant's App., Vol. I at 118.) Though he claims he thought the payment was a down payment for a ranch, he received the money

wrapped in newspaper and secured with electrical tape without question—he neither unwrapped nor counted the money and did not offer a receipt. Chavez referred to Lopez, the organization's "kingpin," in his conversation with Rayos and Terrazas even though he claimed not to know him. (Oral Argument at 16:45, 23:27.) Chavez stated he might have trouble with the customs agents at the border but explained he was taking his son with him and waived toward the car seat, suggesting he intended to conceal the money in the car seat. Finally, Chavez requested Rayos' phone number and asked Rayos and Terrazas to follow him to his house so they would know where he lived to facilitate the next payment. There would have been no further payment if the money represented a down payment for a ranch. The jury could have found Chavez's conduct was more consistent with the receipt of drug money than a legitimate payment.

Chavez provided an alternative explanation of the events, but obviously the jury chose not to believe him and the witnesses he called on his behalf. "[T]he evidence supporting the conviction . . . need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir.) (quotations omitted), *cert. denied*, 128 S. Ct. 2979 (2008). Credibility determinations are within the exclusive province of the jury and are not for this Court to second-guess. *See United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002) ("In reviewing the evidence, we do not weigh conflicting evidence or consider witness

-8-

credibility, as that duty is delegated exclusively to the jury."). In evaluating a sufficiency of the evidence claim, "our restrictive standard of review . . . provides us with very little leeway." *Sells*, 477 F.3d at 1235 (quotations omitted). Here, the jury could reasonably have found all the elements of a conspiracy were present and thus, the evidence was sufficient to support Chavez' conviction.

B.  Jury Instruction

After instructing the jury on the elements of a conspiracy, the court, over defense counsel's objection, instructed the jury on deliberate ignorance:

> The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident. You may find that the defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

(Appellee's Br. at 16.) Chavez contends the court erred in giving this instruction because it was not supported by the evidence.[6] The government contends the instruction was proper because Chavez' defense at trial was that he did not know the money he received was drug money and "[t]here is ample evidence in the record that [Chavez] deliberately avoided creating evidence of what he knew, *i.e.*, he turned a blind eye to what otherwise would have been obvious." (Appellee's Br. at 17-18.)

---

[6] Notably, Chavez does not contend the instruction misstated the law.

We have repeatedly applied a de novo standard to review the propriety of a deliberate ignorance instruction.[7] *See, e.g.*, *United States v. Espinoza*, 244 F.3d 1234, 1241 (10th Cir. 2001); *United States v. Delreal-Ordones*, 213 F.3d 1263, 1264 (10th Cir. 2000); *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991).

> A deliberate ignorance instruction is appropriate when a defendant denies knowledge of an operant fact but the evidence, direct or circumstantial, shows that defendant engaged in deliberate acts to avoid actual knowledge of that operant fact. Such an instruction alerts a jury that conscious avoidance of knowledge in order to have a defense at trial suggests a sufficient guilty knowledge to satisfy the knowing element of the crime.

*United States v. Baz*, 442 F.3d 1269, 1271-72 (10th Cir. 2006) (quotations and citations omitted). Here, Chavez denied knowing the money he received was drug money and a reasonable jury could find from the evidence presented at trial that he either knew the money was drug money or engaged in deliberate acts to avoid such knowledge. *See Espinoza*, 244 F.3d at 1244 ("[U]nder the precedents of this circuit, the jury may properly infer from the same evidence either that the Defendant had actual knowledge or that he deliberately avoided acquiring such knowledge.").

---

[7] In other contexts, we have reviewed the district court's decision to give a particular instruction in a criminal trial for an abuse of discretion. *See, e.g.*, *United States v. McPhilomy*, 270 F.3d 1302, 1310 (10th Cir. 2001); *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1262 (10th Cir. 1999). We need not resolve this apparent conflict in our case law because the government "acquiesces to the broader [de novo] standard of review," and applying a more deferential standard of review would not lead to a different result. (Appellee's Br. at 15, n.6.)

In *Baz*, the defendant claimed to be transporting computer servers in cardboard boxes for a friend. 442 F.3d at 1271. Instead of computer equipment, the boxes contained approximately 476 pounds of marijuana. We held the evidence was sufficient to support a deliberate ignorance instruction because the defendant "had ample reason to be suspicious of the cargo he transported, but consciously avoided acquiring actual knowledge regarding its true contents." *Id.* at 1272. Similarly, in *Delreal-Ordones*, the defendant claimed he was not aware he was transporting methamphetamine in a laundry detergent box in his suitcase. 213 F.3d at 1268. We held the court did not err in giving a deliberate ignorance instruction because the facts "support[] an inference of Defendant's guilty knowledge" and "a jury could readily conclude that despite a clear opportunity to do so, Defendant purposely declined to learn more about his suitcase's contents." *Id.* at 1269 (quotations omitted); *see also Espinoza*, 244 F.3d at 1242-43 (10th Cir. 2001) (holding the court did not err in giving a deliberate ignorance instruction where the defendant claimed he was not transporting a controlled substance but where, *inter alia*, he failed to ask his wife if there was marijuana in the truck).

Like in *Baz*, *Delreal-Ordones*, and *Espinoza*, a reasonable jury could have found Chavez had reason to suspect the money he received from Rayos and Terrazas represented drug proceeds rather than the down payment for a ranch, but consciously avoided confirming his suspicion. Chavez did not ask either Rayos

or Terrazas what the money was for or why it was packaged in newspaper and electrical tape. He did not unwrap or count the money and did not offer a receipt. Chavez made small-talk with Rayos and Terrazas but did not ask anything about the alleged ranch. He stated he was instructed to tell Rayos and Terrazas that Lopez sent him. He conducted the transaction in private and employed two different methods to lessen his chance of detection (false license plates and the child seat).

Chavez claims the instruction allowed the jury to find he was guilty "if he negligently or foolishly remained ignorant" which "amounted to allowing [him] to be convicted of a crime requiring intentional and knowing conduct by employing a negligence standard . . . ." (Appellant's Br. at 20.) We have recognized this danger:

> The danger in giving the instruction where there is evidence of direct knowledge but no evidence of avoidance of knowledge is that the jury could still convict a defendant who merely should have known about the criminal venture. Conviction because the defendant "should have known" is tantamount to conviction for negligence, contrary to section 841(a) which requires intentional misbehavior.

*Francisco-Lopez*, 939 F.2d at 1410 (quotations and citation omitted). Here, however, the court specifically instructed the jury "knowledge . . . *cannot* be established merely by demonstrating that the defendant was negligent, careless, or foolish . . . ." (Appellee's Br. at 16 (emphasis added).) In light of this language and considering the evidence in the light most favorable to the government, as we must, we see no error in the court's instruction.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge