BRISCOE, Circuit Judge,
dissenting:
I respectfully dissent. When properly considered, neither of the constitutional challenges asserted by U.S. West warrants setting aside the FCC’s CPNI Order, which I believe represents a reasonable interpretation of 47 U.S.C. § 222. I would therefore deny the petition for review and affirm the CPNI Order.
I.
Before addressing U.S. West’s challenges to the CPNI Order, I begin by briefly recounting how this dispute arose. In 1996, Congress decided to place restrictions on the use of CPNI collected by telecommunications carriers. In particular, Congress chose to require carriers to obtain customer approval prior to using, disclosing, or allowing access to individually identifiable CPNI. See 47 U.S.C. § 222. Following enactment of § 222, the FCC received several informal requests from members of the telecommunications industry for guidance in interpreting the statute’s customer approval requirement. The FCC responded by issuing a Notice of Proposed Rulemaking “tentatively con-cludfing] ... that regulations interpreting and specifying in greater detail a carrier’s obligations under section 222 would be in the public interest,” and seeking public comment on various aspects of § 222, including the statute’s customer approval requirement. CPNI Order, at 12.
On February 26, 1998, the FCC issued its CPNI Order interpreting § 222’s customer approval requirements. In pertinent part, the FCC concluded § 222 was ambiguous in that it did “not specify what kind of approval [wa]s required” to be obtained by a carrier prior to use of individually identifiable CPNI. Id. at 67. In resolving this ambiguity, the FCC noted that interested parties (including U.S. West) had “offer[ed] three separate views, ranging from a most restrictive interpretation that would require approval to be in writing, to a permissive one, where carriers merely would need to provide customers with a notice of their intent to use CPNI, and a mechanism for customers to ‘opt-out’ from this proposed use (notice and opt-out).” Id. After weighing these proffered options, the FCC adopted an “opt-in” approach whereby carriers must “give customers explicit notice of their CPNI rights prior to any solicitation for approval,” and then must obtain from the customer “express written, oral, or electronic approval for CPNI uses.” Id. at 68.
Dissatisfied with the FCC’s selection of the “opt-in” approach, rather than its suggested opt-out approach (which is allegedly cheaper and results in a higher “approval” rate than the opt-in approach), U.S. West filed this action challenging the validity of the FCC’s CPNI Order. In particular, U.S. West contends the portion of the CPNI Order interpreting § 222’s approval requirement violates the First and Fifth Amendments of the United States Constitution.[1] US West also contends that por *1241 tion of the CPNI Order is “a gratuitously severe construction” of § 222.
II.
“United States Courts of Appeals have been granted exclusive statutory jurisdiction to review the FCC’s final orders pursuant to 28 U.S.C. § 2342(1) (1994) and 47 U.S.C. § 402(a) (1994).” Iowa Utilities Bd. v. FCC, 120 F.3d 753, 793 (8th Cir.1997), aff'd in part and rev’d in part, — U.S. -, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998). In reviewing the CPNI Order at issue in this case, which represents the FCC’s construction of a statute it is charged with administering, we are initially “confronted with two questions.” Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). “First, always, is the question whether Congress has directly spoken to the precise question at issue.” Id. “If the intent of Congress is clear, that is the end of the matter; for [we], as well as the agency, must give effect to the unambiguously expressed intent of Congress.” Id. at 842-43, 104 S.Ct. 2778. “If, however, [we] determine[ ] Congress has not directly addressed the precise question at issue, [we] do[ ] not simply impose [our] own construction on the statute.” Id. at 843, 104 S.Ct. 2778. “Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for [us] is whether the agency’s answer is based on a permissible construction of the statute.” Id.
In my view, § 222, in particular subsection (c)(1), is unambiguous in the sense that Congress made it abundantly clear it intended for telecommunications carriers to obtain customer “approval” prior to using, disclosing, or permitting access to individually identifiable CPNI. Although Congress did not specifically define the term “approval” in the statute, its ordinary and natural meaning clearly “implies knowledge and exercise of discretion after knowledge.” Black’s Law Dictionary at 102 (6th ed.1990); see United States v. Roberts, 88 F.3d 872, 877 (10th Cir.1996) (if Congress does not define statutory term, “its common and ordinary usage may be obtained by reference to a dictionary”); United States v. Floyd, 81 F.3d 1517, 1523 (10th Cir.1996) (“In interpreting Congressional intent, a reviewing court must determine whether the language used in a statute is ambiguous, or whether it has an ordinary meaning.”). In other words, it is clear from the statute that Congress intended for customers to make an informed decision as to whether they would allow their individually identifiable CPNI to be used.[2]
The remaining issue is whether the statute indicates the precise method a carrier must use to obtain customer approval. On this point, I agree with the FCC that the statute is ambiguous. See CPNI Order at 70. Although it is clear from the statute that a customer must be made aware of his or her rights regarding CPNI and be allowed to make an informed decision regarding its use, the statute is silent with respect to precisely how a carrier must obtain this approval from its customers. The question therefore becomes whether the FCC’s construction of the statute (to remedy the ambiguity) is reasonable. In deciding this question, we “may not substitute [our] own construction of [the] statutory provision for a reasonable interpretation made by the” FCC. Chevron, 467 U.S. at 844, 104 S.Ct. 2778.
Because the approval requirement imposed by Congress in § 222 is fairly rigorous in that it requires customer knowledge and exercise of discretion after knowledge, the methods available for obtaining such approval were obviously limited. Indeed, the CPNI Order indicates interested parties proposed only three possible methods for obtaining approval: (1) requiring ex *1242 press written approval, (2) requiring express written, oral, or electronic approval (the opt-in method), or (3) requiring only-implied approval by allowing carriers to notify customers of their intent to use CPNI and affording customers a mechanism to “opt-out” if they did not want their CPNI, to be used (the opt-out method). After quickly disposing of the most restrictive of these, three options (i.e., the method requiring express written approval)[3], the FCC carefully weighed the advantages and disadvantages of the two remaining options, i.e., the opt-in and the opt-out approaches. CPNI Order at 67-85. Ultimately, the FCC concluded the opt-in approach was best suited to forwarding the purpose of the statute:
We conclude ... that an express approval mechanism is the best means to implement [§ 222’s approval requirement] because it will minimize any unwanted or unknowing disclosure of CPNI. In addition, such a mechanism will limit the potential for untoward competitive advantages by incumbent carriers. Our conclusion is guided by the natural, common sense understanding of the term “approval,” which we believe generally connotes an informed and deliberate response. An express approval best ensures such a knowing response. In contrast, under an opt-out approach, ... because customers may not read their CPNI notices, there is no assurance that any implied consent would be truly informed. We agree with the observations of MCI and Sprint that, insofar as customers may not actually consider CPNI notices under a notice and opt-out approach, they may be unaware of the privacy protections afforded by section 222, and may not understand that they must take affirmative steps to restrict access to sensitive information. We therefore find it difficult to construe a customer’s failure to respond to a notice as constituting an informed approval of its contents. Accordingly, we adopt a mechanism of express approval because we find that it is the best means at this time to achieve the goal of ensuring informed customer approval.
Id. at 70-71.
After reviewing the CPNI Order and the administrative record, I am convinced the FCC’s interpretation of § 222, more specifically its selection of the opt-in method for obtaining customer approval, is entirely reasonable. Indeed, the CPNI Order makes a strong case that, of the two options seriously considered by the FCC, the opt-in method is the only one that legitimately forwards Congress’ goal of ensuring that customers give informed consent for use of their individually identifiable CPNI. Accordingly, in applying the rubric set forth in Chevron, and barring any serious constitutional problems posed by the CPNI Order, we must defer to the FCC’s selection of the opt-in method in resolving the statutory ambiguity presented in this case.
III.
Having concluded the CPNI Order is worthy of deference under the standards outlined in Chevron, I now turn to the constitutional challenges asserted by U.S. West. See Rust v. Sullivan, 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (reviewing challenged regulation under Chevron standards before addressing plaintiffs constitutional challenges). It is true that courts need not defer to an agency’s interpretation of a federal statute if that interpretation raises serious constitutional questions. See DeBartolo Corp. v. Florida Gulf Coast Bldg, and Const. Trades Council, 485 U.S. 568, 574, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (although NLRB’s interpretation of NLRA was normally entitled to deference, Court refused to defer in this instance because the NLRB’s interpretation raised serious First Amendment issues). This canon of *1243 statutory construction, however, is not applied in every case where an agency interpretation is challenged on constitutional grounds. Rather, “courts [should] scrutinize constitutional objections to a particular agency interpretation skeptically,” and “[o]nly if the agency’s proffered interpretation raises serious constitutional concerns [should] a court refuse to defer under Chevron.” Williams v. Babbitt, 115 F.3d 657, 662 (9th Cir.1997) (italics in original), cert. denied, — U.S. -, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998); see Rust 500 U.S. at 191-92, 111 S.Ct. 1759 (although regulations were challenged on constitutional grounds, Court granted Chevron deference to regulations and addressed constitutional question on the merits); Republican Nat’l Comm. v. Federal Election Comm’n, 76 F.3d 400, 409 (D.C.Cir.1996) (court applied Chevron deference because it was able to “easily resolve ... First Amendment challenges [to the regulation] through the application of controlling precedent”). In short, “constitutional narrowing should displace Chevron only when the constitutional problems are truly ‘grave’ and never when it would effectively preclude all policy options because all possible interpretations raise constitutional problems.” Williams, 115 F.3d at 663.
For the reasons that follow, I conclude neither of the constitutional challenges asserted by U.S. West is serious enough to warrant abandoning the traditional deference we grant agency, interpretations under Chevron.

First Amendment challenge

US West contends the CPNI Order “violates the First Amendment by requiring that carriers secure prior affirmative consents from customers before using individually-identifíable customer information to speak with their customers on an individualized basis about services beyond the ‘categories’ of telecommunications services to which they currently subscribe.” US West’s Opening Brief at 22. In other words, U.S. West suggests the CPNI Order unduly limits its ability to engage in commercial speech with its existing customers regarding new products and services it may offer. US West also claims the CPNI Order “restricts the ability of carriers to share and use CPNI internally-to have different divisions, affiliates, and personnel within the same carrier communicate information to each other (i.e., to speak to each other), absent a prior affirmative consent from the customer.” Id.
The problem with U.S. West’s arguments is they are more appropriately aimed at the restrictions and requirements outlined in § 222 rather than the approval method adopted in the CPNI Order. As outlined above, it is the statute, not the CPNI Order, that prohibits a carrier from using, disclosing, or permitting access to individually identifiable CPNI without first obtaining informed consent from its customers. Yet U.S. West has not challenged the constitutionality of § 222, and this is not the proper forum for addressing such a challenge even if it was raised.[4] Thus, we must assume the restrictions and requirements outlined in the statute are constitutional. More specifically, we must assume the statute’s restrictions on the use of CPNI, and its requirement that a carrier obtain customer approval prior to using, disclosing, or permitting access to individually identifiable CPNI, do not violate the First Amendment.
Focusing strictly, then, on the portion of the CPNI Order challenged by U.S. West, I find nothing that warrants First Amendment scrutiny. As previously noted, the portion of the CPNI Order at issue in this case simply adopts from an extremely limited range of choices the particular method a carrier must use in obtaining customer approval. In my view, nothing about this selection method, viewed alone, impacts expressive activity. At bottom, the CPNI Order narrowly impacts a carrier’s nonex- *1244 pressive activity by requiring it to obtain express, rather than implied, customer approval. The CPNI Order does not, however, directly impact a carrier’s expressive activity (by, for example, limiting the manner in which a carrier can speak), nor does it indirectly impact a carrier’s expressive activity in such a manner as to warrant First Amendment scrutiny. See generally Arcara v. Cloud Books, Inc., 478 U.S. 697, 702-07, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (discussing when First Amendment scrutiny will and will not be applied to a statute).
Although the majority attempts to explain how the CPNI Order impacts U.S. West’s free speech rights, its analysis is frustratingly vague.[5] Indeed, the majority’s discussion of this critical point contains no reference to the opt-in method selected by the FCC in the CPNI Order. Instead, the majority strays from the narrow scope of the CPNI Order and effectively takes into account the statutory restrictions on CPNI usage. Unfortunately, this error permeates not only the majority’s threshold analysis of whether the CPNI Order implicates U.S. West’s free speech rights, but its subsequent First Amendment analysis as well.[6]
In order to highlight the deficiencies in the majority’s First Amendment analysis, I will assume, for purposes of argument only, that the CPNI Order impacts a carrier’s free speech rights in a manner sufficient to warrant First Amendment scrutiny. I will also accept, for purposes of the following discussion, the majority’s conclusions that the speech affected by the CPNI Order is commercial speech subject to First Amendment analysis under the test outlined in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm’n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). As noted by the majority, protected commercial speech (i.e., commercial speech that is neither misleading nor unlawful) may be regulated only if “the government can show that (1) it has a substantial state interest in regulating the speech, (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest.” Revo v. Disciplinary Bd. of the Supreme Ct. of New Mexico, 106 F.3d 929, 932 (10th Cir.) (outlining Central Hudson test).
A review of § 222 indicates Congress had a two-fold interest in regulating the disclosure of CPNI: the protection of consumer privacy and the promotion of fair competition among telecommunications carriers. In my view, Supreme Court and circuit precedent clearly supports the conclusion that both of these interests are “substantial” for First Amendment purposes. See, e.g., Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 117 S.Ct. 1174, 1186, 137 L.Ed.2d 369 (1997) (concluding federal government had substantial interest in promoting fair competition in market for television programming); Went For It, 515 U.S. at 624-25, 115 S.Ct. 2371 (concluding Florida Bar Association had substantial interest in protecting privacy of personal injury victims by prohibiting invasive and unsolicited contact by lawyers); Van Bergen v. State of Minnesota, 59 F.3d 1541, 1555 (8th Cir.1995) (concluding government had substantial interest, motivated by protecting consumer privacy, in limiting use of unsolicited sales calls by auto-dialing/announcing devices); Lanphere & Urbaniak v. *1245 State of Colorado, 21 F.3d 1508, 1514-15 (10th Cir.1994) (concluding government had substantial interest in protecting privacy of persons charged with misdemeanor traffic offenses and DUI); Curtis v. Thompson, 840 F.2d 1291, 1300 (7th Cir.1988) (“When the fundamental right to privacy clashes with the right of free expression, the interest in privacy does not play second fiddle when the speech is merely intended to propose a commercial transaction.”).
Although the majority ultimately accepts Congress’ interest in protecting customer privacy, it does so only after disparaging that interest and offering its own views concerning the advantages and disadvantages of protecting the privacy of consumer information. “Judges are not experts in the field [being regulated], and are not part of either political branch of the Government.” Chevron, 467 U.S. at 865, 104 S.Ct. 2778. The majority also criticizes the FCC for failing to offer “a more empirical explanation and justification” for the privacy interest. Majority Opinion at 21. The problem with this criticism is that, once again, the majority ignores the procedural context of this case. The privacy interest did not originate with the FCC or the CPNI Order; rather, it originated with Congress when it enacted the restrictions outlined in § 222. Precisely how the FCC could have or, for that matter, why it would have included in the administrative record “more empirical explanation and justification” for an interest that originated with Congress, and thus predated the administrative process in this case, is unclear.[7] As an administrative agency, and not an independent branch of government, the FCC was obligated to implement without question Congress’ directive to require some form of customer approval.
Even more disturbingly, the majority rejects outright any Congressional interest in promoting competition. Although I agree protection of customer privacy is perhaps the dominant purpose of § 222, it is impossible to ignore the fact that § 222 was enacted as part of the Telecommunications Act of 1996, the entire purpose of which was “[t]o promote competition ... in order to secure lower prices and higher quality services for American telecommunications consumers.” Pub.L. No. 104-104, 110 Stat. 56, 56 (1996); see In re Graven, 936 F.2d 378, 385 (8th Cir.1991) (when interpreting statute, court looks not only to its express language, but also to overall purpose of act of which it is a part). Indeed, the notion that promotion of competition was one of Congress’ purposes in enacting § 222 is entirely consistent with the plain language of the statute itself. By restricting carriers’ usage of CPNI, § 222 helps diminish anticompetitive barriers in the telecommunications market by requiring carriers (both large and small) to rely on methods other than analysis of existing CPNI to promote their products, and thereby reduces the possibility that a carrier will easily convert its existing customers for a particular product or service into customers for its new products or services.
Turning to the next prong of Central Hudson, I conclude the restrictions outlined in § 222 directly and materially advance Congress’ twin interests of protecting customer privacy and promoting competition. By preventing a carrier from using, disclosing, or permitting access to individually identifiable CPNI without customer approval, § 222 directly promotes the goal of protecting customer privacy. Indeed, § 222 arguably promotes the First Amendment rights of consumers by allowing them to call *1246 whom they wish when they wish without fear that their calling records will be disclosed to others. Likewise, § 222’s limitations on the use of CPNI appear to promote competition by “leveling the playing field” among carriers offering new types of telecommunications markets. For example, § 222 makes it more difficult for a large long-distance carrier (such as AT & T) to develop an immediate monopoly in a new telecommunications market (e.g., PCS) by limiting its use of CPNI obtained from its long-distance customers.
In addressing this prong of Central Hudson, the majority once again ignores the procedural context of the case and criticizes the FCC for “present[ing] no evidence showing the harm to either privacy or competition is real.” Majority Opinion at 25. As stated above, because the two interests originated with Congress and thus predated the administrative process that led to the issuance of the CPNI Order, it is unclear precisely what the majority believes the FCC should have done to bolster the administrative record. Indeed, I submit it was wholly unnecessary for the FCC to collect or consider any evidence regarding these two Congressional interests. Instead, the FCC’s much more narrow responsibility, which I believe it reasonably fulfilled, was to fill in the gaps left by Congress when it enacted § 222.
Finally, I turn to the last prong of Central Hudson, which asks whether the restrictions at issue are narrowly tailored to achieving the government’s interests. In Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Supreme Court emphasized the “fit” between the restrictions and the governmental interests need not be “necessarily perfect, but reasonable.” In other words, the restrictions do not have to represent “the single best disposition but one whose scope is in proportion to the interest served.” Id. Before addressing the CPNI Order, I again note U.S. West has not challenged § 222, and has thus effectively conceded the requirement of customer approval is narrowly tailored to achieving the interests of privacy and competition. As for the CPNI Order itself, I am convinced it is also narrowly tailored to achieving these same interests. The administrative record convincingly demonstrates that, of the limited options available to the FCC, the opt-in method of obtaining customer approval was the most reasonable solution. As the FCC concluded in the CPNI Order, the method of implied approval suggested by U.S. West (i.e., the opt-out method) did not ensure that the Congressional goal of informed customer consent would be satisfied. As for the two express methods of approval available to it, the FCC chose the least restrictive method available. More specifically, the FCC rejected the express written approval method as too restrictive, and adopted the opt-in method which allows carriers to obtain express written, oral, or electronic approval from customers. Ultimately, I conclude the FCC’s selection satisfies the last Central Hudson prong because it represents a “carefu[l] calculation of] the costs and benefits associated with the burden on speech imposed by its prohibition.” Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (internal quotation marks omitted).
The majority, focusing at this point on the CPNI Order rather than the statute, concludes the FCC failed to adequately consider the opt-out method, which the majority characterizes as “an obvious and substantially less restrictive alternative” than the opt-in method. Majority Opinion at 29. Notably, however, the majority fails to explain why, in its view, the opt-out method is substantially less restrictive. Presumably, the majority is relying on the fact that the opt-out method typically results in a higher “approval” rate than the opt-in method. Were mere “approval” percentages the only factor relevant to our discussion, the majority would perhaps be correct. As the FCC persuasively concluded in the CPNI Order, however, the opt-out method simply does not comply with § 222’s requirement of informed con *1247 sent. In particular, the opt-out method, unlike the opt-in method, does not guarantee that a customer will make an informed decision about usage of his or her individually identifiable CPNI. To the contrary, the opt-out method creates the very real possibility of “uninformed” customer approval. In the end, I reiterate my point that the opt-in method selected by the FCC is the only method of obtaining approval that serves the governmental interests at issue while simultaneously complying with the express requirement of the statute (i.e., obtaining informed customer consent).
In summary, as U.S. West has not challenged the constitutionality of § 222, there is no need to subject the CPNI Order to First Amendment scrutiny. Even assuming, arguendo, such scrutiny is required, I conclude the CPNI Order does not violate U.S. West’s First Amendment rights. In my view, U.S. West has not posed a “grave” First Amendment challenge to the CPNI Order.

Fifth Amendment challenge

U.S. West also contends the FCC’s restrictions on the disclosure of CPNI are so severe they constitute a regulatory taking of property without just compensation, in violation of the Takings Clause of the Fifth Amendment. As with its First Amendment claim, U.S. West is again, in my view, aiming at the statutory restrictions rather than the narrow portion of the CPNI Order at issue in this case. Even assuming, for purposes of argument, that U.S. West’s “takings” argument is focused solely on the CPNI Order, I find no merit to it.[8]
The Fifth Amendment provides, in pertinent part: “nor shall private property be taken for public use, without just compensation.” U.S. Const, amend. V. “The purpose of the Fifth Amendment is to prevent the ‘[government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.’ ” 767 Third Avenue Assoc. v. United States, 48 F.3d 1575, 1580 (Fed.Cir.1995) (quoting Penn Central Transp. Co. v. New York City, 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).
In addressing U.S. West’s takings argument, the threshold question is whether CPNI constitutes “property” for purposes of the Takings Clause. US West gives short shrift to this issue, arguing the decision in Ruckelshaus v. Monsanto Co., 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), establishes that CPNI is protecta-ble property for purposes of the Takings Clause. In Monsanto, plaintiff Monsanto, a pesticide manufacturer doing business in Missouri, filed suit challenging certain amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 et seq., requiring it to disclose to the EPA various health, environmental, and safety data related to its products. In addressing Monsanto’s assertion that the challenged regulations constituted a takings under the Fifth Amendment, the Court held “that to the extent that Monsanto ha[d] an interest in its health, safety, and environmental data cognizable as a trade secret property right under Missouri law, that property right [wa]s protected by the Taking Clause of the Fifth Amendment.” 467 U.S. at 1003-04, 104 S.Ct. 2862.
Although Monsanto certainly sets the stage for treatment of CPNI as property for Fifth Amendment purposes, U.S. West has failed to take the requisite step of demonstrating that CPNI qualifies as trade secret property, or any other kind of protectable property interest, under state law. Therefore, there is no basis for eon- *1248 eluding U.S. West has presented a “grave” or “serious” Fifth Amendment challenge to the CPNI Order.
IV.
In conclusion, I view U.S. West’s petition for review as little more than a run-of-the-mill attack on an agency order “clothed by ingenious argument in the garb” of First and Fifth Amendment issues. Zemel v. Rusk, 381 U.S. 1, 16-17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Because there is no merit to those constitutional arguments, and because the FCC’s CPNI Order is an entirely reasonable interpretation of 47 U.S.C. § 222, I would deny U.S. West’s petition for review and affirm the CPNI Order.

. This litigation strategy is apparently not unique to this case. In another case filed in this circuit involving substantially different facts, U.S. West asserted strikingly similar constitutional arguments. See U.S. West, Inc. v. Tristani, 182 F.3d 1202 (10th Cir.1999) (asserting First and Fifth Amendment chai- *1241 lenges to rate order of the New Mexico State Corporation Commission).

. US West does not deny that the statute requires it to obtain informed consent from each of its customers regarding their individually identifiable CPNI.

. See CPNI Order at 87 ("Given that nothing in section 222(c)(1) expressly limits approval to only written means, we conclude that carriers should be given flexibility to secure approval through written, oral or electronic methods.”).

. I have found no authority that would allow us, in the context of reviewing the CPNI Order, to pass on the constitutionality of § 222. Indeed, the most this court can do is strike the CPNI Order, which would have no effect on the continued validity of the statute.

. Although the majority cites Florida Bar v. Went For It, Inc., 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) in support of its limited analysis, that case is quite different from the instant action. At issue in Went For It was a Florida Bar rule that restricted attorneys’ use of direct mail advertisements; in other words, a rule that directly impacted attorneys' commercial speech. Here, in contrast, the CPNI Order does not directly affect any form of expressive activity engaged in by U.S. West or other telecommunications carriers.

. It is difficult to tell from the majority’s opinion where its analysis of the CPNI Order ends and its analysis of the statute begins. For much of the opinion, the majority appears to be reviewing the constitutionality of § 222 rather than the CPNI Order.

. The majority holding presents a serious dilemma for the FCC. Because U.S. West has not challenged the constitutionality of § 222, carriers remain statutorily bound to obtain customer “approval” prior to using, disclosing, or granting access to individually identifiable CPNI. Further, the question of how this approval is to be obtained remains open. Thus, il would seem that, in light of the majority’s opinion, the FCC must again attempt to formulate a method for obtaining such approval. It is unclear whether the FCC will now effectively be bound to adopt the opt-out method advocated by U.S. West and the majority.

. I find U.S. West’s takings claim inconsistent with its First Amendment claim. In particular, the more accessible CPNI is to various employees within the company, the less likely it is that CPNI will be deemed a trade secret and thereby be entitled to protection under the Fifth Amendment's Taking Clause. Moreover, if CPNI is disclosed to outside companies, it would clearly lose any protection as a trade secret and would not be considered property protectable under the Fifth Amendment.