**F I L E D**

**PUBLISH**

**March 1, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SHELBY WAYNE SELLS;
ANTHONY WAYNE SELLS,

    Defendants - Appellants.

Nos. 04-7061 & 04-7072

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. CR-03-69-WH)**

---

Jill M. Wichlens, Assistant Federal Public Defender, Denver Colorado (Raymond P. Moore, Federal Public Defender with her on the briefs) for Defendant-Appellant Shelby Wayne Sells.

Donn F. Baker, Tahlequah, Oklahoma for Defendant-Appellant Anthony Wayne Sells.

Dennis Fries, Assistant United States Attorney, Muskogee, Oklahoma (Sheldon J. Sperling, United States Attorney, Jeffrey A. Gallant, Assistant United States Attorney, on the briefs) for the Plaintiff-Appellee.

---

Before **LUCERO**, **McKAY**, and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

We have combined these separate appeals solely for the purpose of disposition. Between early 2002 and July 2003, Shelby Sells and his son Anthony Sells were engaged in a large-scale methamphetamine manufacturing and distribution operation on Shelby's property in rural Sequoyah County, Oklahoma. Both were convicted of drug and firearm offenses relating to their participation in this enterprise, and sentenced to substantial terms of imprisonment. Anthony[1] appeals both his convictions and sentence. Because we conclude that reversible error did not occur with respect to either, we **AFFIRM**. Shelby appeals only his sentence. The government concedes that the district court committed <u>Booker</u> error in sentencing Shelby, and that this error was not harmless. In addition, we conclude the district court's determination of the drug amount attributable to Shelby was insufficiently particularized. Thus, on the government's concession, with respect to Shelby Sells, we **REVERSE** and **REMAND** for resentencing.

**I**

Sixty-one year old Shelby Sells lived with his wife Maxine on a ten-acre property he owned in Sequoyah County, Oklahoma. In addition to Shelby's house, the property contained numerous small buildings, miscellaneous items relating to Shelby's junk business, and two other residences. One house, located near the rear of the property and more than two hundred yards behind Shelby's

---

[1] Because three members of the Sells family are discussed in this opinion – Anthony, Christopher, and Shelby – we refer to them by their first names when appropriate.

home, was occupied by Anthony. The other, approximately fifty yards away from Shelby's residence, was occupied by Shelby's grandson Christopher Sells.

Based on information obtained from confidential informants that Anthony was engaged in manufacturing methamphetamine, members of the Sequoyah County Sheriff's Department obtained a warrant to search Anthony's home on Shelby's property. In the early morning hours of July 12, 2002, members of the Sheriff's Department, federal agents from the Department of Alcohol, Tobacco, and Firearms ("ATF"), and other law enforcement personnel executed the search. After their attempts to knock and announce went unanswered, agents forcibly entered. They observed Anthony emptying a large jar of liquid into the kitchen sink.[2] During the ensuing search, agents found substantial evidence that Anthony was manufacturing and distributing methamphetamine, including: (1) a "bag lab" in Anthony's living room containing the precursor chemicals and equipment needed to manufacture methamphetamine; (2) glass canisters, scales, protective goggles, a respirator, and other equipment commonly used in the manufacturing and distribution of methamphetamine;[3] (3) 38.3 grams of pseudoephedrine, the base ingredient used to make methamphetamine; (4) 28.3 grams of a

---

[2] Because the sink drained outside, agents were able to recover a sample of the liquid, which tested positive for methamphetamine.

[3] Some of these items contained a white powder residue. Others had amber stains caused by contact with iodine, a chemical used in the manufacturing process.

methamphetamine mixture; and (5) precursor chemicals and cutting agents commonly used in the manufacture of methamphetamine. Also recovered from the home were two firearms, both within Anthony's reach when agents entered. One officer testified that while inside the residence he smelled a strong chemical odor associated with methamphetamine manufacturing.

Following the search, federal authorities continued their investigation, ultimately obtaining search warrants for each of the three residences on the property. On December 11, 2002, state and federal law enforcement officers executed those warrants. In Anthony's residence, agents initially did not find substantial and direct evidence that Anthony was continuing to manufacture and distribute methamphetamine.[4] When they opened the lit wood-burning stove in his residence, however, authorities observed in the glow of the fire equipment used in the manufacturing process[5] and burning U.S. currency. A sample of the stove's contents tested positive for pseudoephedrine and methamphetamine.

---

[4] They did find nine pseudoephedrine tablets in Anthony's shirt pocket, a spray bottle filled with iodine, 78 empty blister packs previously containing pseudoephedrine pills, a razor blade and a metal spoon containing white powder residue, acetone (a solvent used to manufacture methamphetamine), and a piece of PVC pipe painted with a camouflage pattern.

[5] Inside the stove were melting blister packs previously containing pseudoephedrine pills, multiple pills fused together by the heat, red phosphorous, coffee filters containing caked substances, and other items containing white powder residue.

Their search of Anthony's residence was cut short, however, because the air registered as unsafe soon after they opened the stove.

In Shelby's home, authorities found assorted ammunition, a set of precision digital scales (often used by narcotics dealers to weigh small quantities), a bucket of assorted glassware near a set of rubber gloves, small plastic bags, and a tobacco can containing $1500.00 in cash. When officers discovered the money, Shelby claimed that he did not where it came from and abandoned it.

Inside the third residence, where Christopher lived, agents found a two-liter plastic bottle containing a liquid that tested positive for methamphetamine, a small plastic bag of methamphetamine, and a sack containing empty blister packs. In addition to the drug paraphernalia, authorities recovered two shotguns and two phone bills addressed to Shelby.

Approximately six months later, federal authorities received information that, unrepentantly, Anthony was continuing to manufacture methamphetamine at an abandoned structure near the Sells' property and in his residence. They obtained a third search warrant for his residence, and planned to execute the warrant on the morning of July 18, 2003. Shortly before they were scheduled to proceed, Anthony received a call informing him that a search was imminent. Anthony instructed one of his guests, Robert Isaac, to hide a couple of bags and a black case in the woods behind the property. He then instructed another individual, William Keith Edwards, to pack up other items, load them into the

jeep, and hide them in the woods. When Edwards finished his task, he returned to Anthony's home and began burning various pieces of evidence in three large barrels while Anthony washed glassware. Before Anthony left, he handed Edwards the glassware and asked him to dispose of it. All others left soon thereafter.[6]

At approximately 5 a.m. federal and state authorities executed the search warrant. The only person found near the residence was Marion Royal Daniels, found sitting outside Anthony's home in his vehicle. Inside, agents discovered assorted glassware in the sink, a digital scale on a coffee table in Anthony's den, and a BB gun. Outside, agents were able to extinguish the fire in one burning barrel in time to take inventory of its contents: a can of carburetor fluid with a hole punched in the bottom,[7] and blister packs of pseudoephedrine. In the woods behind the Sells' property, authorities uncovered evidence of a "large

---

[6] Members of the ATF's special response team were dropped off before the search to observe the premises, and witnessed these activities. ATF Special Response Team Agent Ruben Chavez observed several people running back and forth, getting into vehicles, knocking on doors, and putting items into fires lit around Anthony and Chris' residences.

[7] Methamphetamine manufacturers will often punch a hole in the bottom of a can of carburetor fluid in order to obtain the ether. Ether is an ingredient often used in manufacturing methamphetamine.

methamphetamine laboratory,"[8] 36.3 grams of pseudoephedrine, 66.3 grams of pure methamphetamine, and 7.5 grams of pure amphetamine.

On November 14, 2003, a grand jury issued an eight-count superceding indictment against Shelby, Anthony, and two other named individuals based on their participation in the alleged methamphetamine conspiracy.[9] Anthony was charged with seven counts: Conspiracy to knowingly and intentionally possess with intent to distribute methamphetamine, and to knowingly and intentionally manufacture and distribute methamphetamine, both in violation of 21 U.S.C. § 846 ("Count One"); Attempt To Manufacture Methamphetamine on or about July 12, 2002, in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count Two"); Possession of a Firearm During Commission of a Drug Trafficking Crime on or about July 12, 2002, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Three");

---

[8] Tucked under rocks and hidden among the trees, perversely reminiscent of an egg hunt, were scales, assorted glassware containing gallons of various liquids (many of which later tested positive for methamphetamine or precursor chemicals), plastic hoses, an air purifier, pill bottles, iodine crystals, a PVC tube covered in camouflage tape, and pseudoephedrine.

[9] The other named individuals were Daniels (Anthony's uncle) and Edwards. The government dismissed the charges against Edwards prior to trial in exchange for his cooperation and testimony. Daniels was charged with conspiracy to manufacture methamphetamine because: (1) His fingerprints were found on glassware obtained from Anthony's residence during the July 18, 2003 search; and (2) He was found at the Sells' property during the July 18, 2003 search. At trial, the only evidence presented establishing his involvement in the conspiracy was provided by a witness deemed non-credible by the district court. All other witnesses testified that he did not assist in the drug operations. Following closing arguments, Daniels moved for a judgment of acquittal, which was granted.

Felon in Possession of a Firearm on or about July 12, 2002, in violation of 18 U.S.C. § 922(g)(1) ("Count Four"); Attempt To Manufacture Methamphetamine on or About July 18, 2003, in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count Six"); Felon in Possession of a Firearm on or about July 18, 2003, in violation of 18 U.S.C. § 922(g)(1) ("Count Seven"); and Establishment of Manufacturing Operations, in violation of 21 U.S.C. § 856(a)(1) ("Count Eight"). Shelby was charged with only three counts: Count One (Conspiracy), Count Eight (Establishment of Manufacturing Operations), and Felon in Possession of Ammunition on December 11, 2002, in violation of 18 U.S.C. § 922(g)(1)("Count Five").

During a five-day trial, the government presented numerous witnesses who testified to the Sells' methamphetamine operations. Holly Brown, Anthony's former girlfriend, testified that she assisted Anthony with manufacturing two to four ounces of methamphetamine more than 200 times, that Shelby would obtain his methamphetamine from Anthony, and that approximately 20 to 25 people visited the Sells' property each day. She also established that the two firearms found during the July 12, 2002 search were owned by Anthony. George Hanna, a frequent visitor to the Sells' property, testified that he purchased a total of approximately five pounds[10] of methamphetamine from Anthony and Shelby.

---

[10] Although Hanna clearly testified to purchasing a five-pound quantity,
(continued...)

Jamie Landherr, another individual who frequented the Sells, testified that she purchased one to two ounces of methamphetamine during each of her six to eight visits to the Sells' property, and that she personally observed Shelby obtain methamphetamine from Anthony for distribution. Mark Osburn testified that Anthony attempted to manufacture methamphetamine the evening prior to the July 12, 2002 search. He also corroborated other testimony regarding the Sells' illegal activities. Edwards testified that Anthony attempted to manufacture methamphetamine the night before the July 18, 2003 search, and described how he assisted Anthony in manufacturing approximately a pound of methamphetamine on several prior occasions. Multiple federal and state law enforcement authorities testified that the items recovered from Anthony and Shelby's residences during the searches were consistent with the manufacture and distribution of methamphetamine.

Anthony was convicted on six of the seven counts for which he was charged and sentenced as follows: 240 months' imprisonment for Counts One, Two, Six, and Eight, all to run concurrently; 120 months' imprisonment for Count Four, to run concurrently with his 240 month sentence; and 60 months' imprisonment for Count Three, to run consecutively to the other sentences. He

[10](...continued)
neither party challenges the one-pound figure attributed to Anthony via Hanna in the PSR, and which the district court relied upon at sentencing.

was acquitted of Count Seven (Possession of a Firearm in Furtherance of a Drug Trafficking Crime on July 18, 2003). Shelby was convicted on all counts, and sentenced at the low end of the Guidelines range: 240 months' imprisonment for Counts One and Eight, to be served concurrently, and 120 months' imprisonment for Count Five, to be served consecutively to the 240 month sentence. Anthony appeals his convictions and sentence. Shelby appeals only his sentence.

## II

### A

Anthony argues the district court erred in failing to enforce a state plea agreement he entered into with state prosecutors for charges stemming from the July 12, 2002 search of his home. He alleges that during the state proceedings the federal government agreed not to prosecute him in federal court based on evidence obtained during that search if he accepted the state plea. He accordingly requests that all charges relying on such evidence be dismissed. The district court rejected that argument. We take the trial court's view of the matter.

Following the July 12 search, Anthony was charged in Oklahoma state court with multiple drug and firearm offenses. He pled nolo contendre to one count of "possession of [a controlled dangerous substance] with intent to distribute" pursuant to a plea agreement, and received a five-year suspended sentence. Addendum B to that plea agreement states:

It is further understood that based upon statements of [sic] Assistant District Attorney that with the entering of these pleas that Federal Authorities have agreed not to institute any proceedings or indictments against this Defendant for any offense surrounding these cases. That Defendant has been told that the various Federal authorities are in agreement with this plea and failure to enter this plea agreement will result in the intervention of said Federal Authorities.

Counts Two, Three, and Four are based entirely on items discovered during the July 12 search, and Counts One and Eight rely in part on such evidence, but also address conduct occurring after Anthony entered into the state plea agreement.

Ordinarily, the federal government is not bound by provisions of a state plea agreement or the representations of a state prosecutor unless it was a party to the state proceedings. See United States v. Padilla, 589 F.2d 481, 484 (10th Cir. 1978). The federal government may become a party to state proceedings if it has knowledge of those proceedings and consents to the representations made by state prosecutors. See United States v. Fuzer, 18 F.3d 517, 520 (7th Cir. 1994) ("[S]tate prosecutors cannot bind federal prosecutors without the latter's consent and knowledge."); Hendrix v. Norris, 81 F.3d 805, 807 (8th Cir. 1996) (same).

Anthony argues the federal government was a party to the state proceedings because his attorney during those proceedings, Bill Ed Rodgers, believed that Oklahoma Assistant District Attorney Lynn Anderson was communicating with federal authorities. During the sentencing hearing, Rogers

testified on this issue, conceding that he knew the state district attorney was not authorized to speak for the federal government at the time. Further, the plea agreement is not signed by an Assistant United States Attorney, nor does it identify the U.S. Attorney who allegedly consented to the inclusion of Addendum B. Notably, Anthony has not produced any evidence that he communicated directly with federal authorities. Absent such evidence, we hold there is no basis to bind the federal government to the terms of the state plea agreement.[11]

**B**

Anthony also argues the evidence presented at trial was insufficient to support his conviction for conspiracy to manufacture and distribute methamphetamine. In evaluating this claim, our "restrictive standard of review for a sufficiency of the evidence question provides us with very little leeway." United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992).

> We review de novo whether the government presented sufficient evidence to support a conviction. In so doing, we view the facts in evidence in the light most favorable to the government. We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury. Rather, our role is limited to determining whether a reasonable jury could find guilt beyond a reasonable doubt, based on

---

[11] State prosecutors should proceed cautiously in making similar representations to state defendants without written authorization by U.S. Attorneys. See, e.g., Santobello v. New York, 404 U.S. 257, 262-63 (1971) (holding that a defendant later prosecuted by federal authorities when assured by state authorities that such prosecution would not occur may use the representation to void the state plea agreement).

the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom.

United States v. Summers, 414 F.3d 1287, 1293-94 (10th Cir. 2005) (citations and quotations omitted).

To establish a conspiracy, the government was required to show: "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, . . . (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." Evans, 970 F.2d at 668 (internal quotation and citation omitted). This burden may be met by either direct or circumstantial evidence. Id. On our review of the lengthy record in this case, the evidence was clearly sufficient to support the jury's verdict.

Anthony appears to have incorrectly assumed that because the charges against Daniels were dismissed, the Anthony-Daniels conspiracy to manufacture methamphetamine charge was no longer provable, thus leaving only a charge that he conspired with Shelby to possess and distribute methamphetamine. Accordingly, he limits his sufficiency challenge to the evidence demonstrating his conspiracy with Shelby.

Count One of the superceding indictment, however, charged that Anthony, Daniels, Shelby, Edwards, and unnamed others conspired to (1) "knowingly and intentionally possess with intent to distribute methamphetamine," and (2)

- 13 -

"knowingly and intentionally manufacture and distribute methamphetamine."

Edwards testified to assisting Anthony manufacture methamphetamine on multiple occasions. Brown, his former girlfriend, testified that during a ten-month period she continually aided Anthony's manufacturing operations. Isaac and Edwards testified to abetting Anthony by hiding evidence of his activities in the woods prior to the July 18, 2003 search. This unrefuted evidence alone supports his conviction on Count One. See United States v. Vaziri, 164 F.3d 556, 566 (10th Cir. 1999) (holding that a defendant charged in a conspiracy with multiple objectives may be convicted based on proof that the defendant conspired to commit any one of the objectives).

Nonetheless, Anthony is also incorrect that there is insufficient evidence to support the finding that he conspired with Shelby. Although there was no evidence of an express agreement between Anthony and Shelby, such an agreement is not required. An agreement "may be inferred from the facts and circumstances of the case," including "frequent contacts among the defendants and from their joint appearances at transactions and negotiations." Evans, 970 F.2d at 669 (citations and quotations omitted); see also United States v. Hartsfield, 976 F.2d 1349, 1354 (10th Cir. 1992).

At trial, Hanna testified that Shelby introduced him to Anthony, and told him that "if he didn't have [the drugs], then I could get them from his son." Brown testified that every time Anthony manufactured methamphetamine, Shelby

would come to his house and collect drugs for distribution. Landherr observed Anthony provide Shelby with methamphetamine, which Shelby sequentially sold to Hanna. Edwards testified that Shelby was often nearby while he and Anthony cooked a batch of methamphetamine. Taking all inferences in favor of the government, a reasonable jury could conclude based on these facts that Anthony had a tacit agreement with Shelby, whereby Anthony manufactured methamphetamine and he and Shelby would then distribute it. Accordingly, we **AFFIRM**.[12]

### C

Anthony's third challenge to his conviction concerns evidence admitted during the trial obtained from Christopher's residence. He claims that the district

---

[12] Anthony's confusion about whether a buyer-seller relationship establishes a conspiracy stems from a misunderstanding of the retail buyer rule. Our circuit has previously held that a buyer in a retail drug transaction is not considered part of the larger conspiracy to manufacture and distribute a drug. See Evans, 970 F.2d at 669 ("Evidence that an intermediate distributor bought from a supplier might be sufficient to link that buyer to a conspiracy to distribute drugs because both buyer and seller share the distribution objective. However, a consumer generally does not share the distribution objective and thus would not be part of a conspiracy to distribute crack cocaine."); United States v. McIntyre, 836 F.2d 467, 471 (10th Cir. 1987). As discussed supra, Anthony's role was much larger than that of a retail buyer. At a minimum, it established that Anthony and Shelby shared a common distribution objective.

Moreover, although Anthony may be correct that Shelby had additional suppliers – such as "Boss Green" or "Old Man Green" – this information is irrelevant to whether a conspiracy existed between father and son. See United States v. Small, 423 F.3d 1164, 1183-84 (10th Cir. 2005) (rejecting defendant drug seller's claim that purchaser's use of an additional supplier precluded a reasonable jury from convicting him of the conspiracy charge).

court improperly admitted this evidence against him because it was irrelevant and prejudicial. He further argues that the district court erred when it denied his motion for a mistrial because admission of this evidence caused a "fatal variance."

**1**

We review the district court's decision whether to grant a mistrial based on a prejudicial variance for abuse of discretion. See United States v. Caballero, 277 F.3d 1235, 1242 (10th Cir. 2002).[13]

This circuit recognizes two types of variances. A constructive amendment, which is reversible per se, occurs when the district court's instructions and the proof offered at trial broaden the indictment. United States v. Wright, 932 F.2d 868, 874 (10th Cir.1991) (overruled on other grounds). A simple variance arises when the evidence adduced at trial establishes facts different from those alleged in the indictment, and triggers harmless error analysis. Hunter v. New Mexico, 916 F.2d 595, 598 (10th Cir. 1990). The defendant bears the burden of proof both

---

[13] Anthony claims that we review de novo whether a variance existed and whether it was fatal. Generally, this statement of the law is correct. See United States v. McLatchey, 217 F.3d 823, 831 (10th Cir. 2000); United States v. Williamson, 53 F.3d 1500, 1512 (10th Cir.1995). However, his argument that the evidence caused a "fatal variance" was in the form of a motion for a mistrial leading to application of a different standard of review. See Caballero, 277 F.3d at 1242. Under either standard, however, our conclusion on this issue is the same.

to show that a variance occurred and that it was fatal.  United States v. Moore, 198 F.3d 793, 795-96 (10th Cir. 1999).

Anthony has not met that burden.  He does not distinguish between the two types of variances, instead arguing generally that  "admission of the testimony and exhibits [related to the items seized from Christopher's home] that had no connection to him" resulted in a fatal variance.  Nor does he identify in detail which charges were subject to the "fatal variance," which is particularly problematic in light of the multiple-count indictment.  Based on our independent review, we conclude that the only charge potentially affected by this evidence was Count Eight, which charged Shelby and Anthony with Establishment of Manufacturing Operations at Rural Route 3, Box 129 (the address of the entire ten-acre property).[14]

Admission of evidence found in Christopher's residence did not constitute a constructive amendment to this charge.  The indictment broadly alleged that Anthony established manufacturing operations throughout the entire property, and Christopher's residence is located on the property.  The only question is whether a simple variance occurred.  Even if admission of this evidence caused a simple variance, it was not fatal, because Anthony is unable to satisfy the second prong

---

[14] All other counts of the indictment refer to items discovered during the July 12, 2002 and July 18, 2003 searches, and only Anthony's house was searched on those dates.  The conspiracy charge is not implicated by this evidence, because nothing found in Christopher's residence establishes any form of conspiracy.

of the harmless error analysis: that the variance substantially prejudiced his rights. See United States v. Windrix, 405 F.3d 1146, 1154 (10th Cir. 2005) ("A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment.") (quotations and citations omitted).

In order to convict someone of establishing manufacturing operations the government must show that "the defendant (1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing by repackaging, distributing, or using any controlled substance." United States v. Verners, 53 F.3d 291, 295 (10th Cir. 1995). A defendant "knowingly maintains" a residence through the following actions:

> Acts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying the food to those at the site, and continuity are, of course, evidence of knowingly maintaining the place considered alone or in combination with evidence of distributing from that place.

Id. at 296 (citing United States v. Clavis, 956 F.2d 1079, 1091 (11th Cir. 1992)).

There is overwhelming evidence that Anthony established manufacturing operations at his residence and used the property generally for such illegal purposes. Even if the evidence proved, as Anthony alleges, that he was not responsible for evidence found in Christopher's house, and thus he did not establish manufacturing operations on the entire property, this merely shows that

the part of the property Anthony established for illicit purposes was smaller than alleged in the indictment. Proof of a narrower scheme than alleged in the indictment does not prejudice a defendant's substantial rights. See Windrix, 405 F.3d at 1154; United States v. McClatchey, 217 F.3d 823, 833-34 (10th Cir. 2000) (same).

A variance may affect the substantial rights of the accused, however, if it is more likely than not that the jury imputed the evidence to the defendant in determining guilt. United States v. Harrison, 942 F.2d 751, 758 (10th Cir. 1991). Based on the record, it is highly unlikely the jury attributed the items found in Christopher's home to Anthony. Eric Booker, the ATF special agent who performed the search of Christopher's residence, admitted that there was no basis to conclude Anthony had any association with that residence or the items found therein. Moreover, the jury demonstrated that it was able to distinguish which items were attributable to whom by acquitting Anthony of Count Seven, which charged him with possession of a firearm found in the woods near his home. See Windrix, 405 F.3d at 1155 (noting that the jury's ability to distinguish the defendant from his co-defendants was demonstrated by its acquittal of a co-defendant on all counts while convicting the defendant).

Anthony has been unable to identify the "fatal variance."  Even if there was

a variance, it did not prejudice his substantial rights.  Accordingly, the district

court did not abuse its discretion in declining to grant a mistrial.[15]

**2**

Anthony contends that evidence of items found in Christopher's home

should have been excluded as irrelevant and unduly prejudicial.  We review the

district court's decision to admit evidence for abuse of discretion.  United States

v. Samaniego, 187 F.3d 1222, 1223 (10th Cir. 1999).

Relevant evidence is "evidence having any tendency to make the existence

of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence."  Fed. R. Evid.

401.  Federal Rule of Evidence 403 provides that such evidence "may be excluded

if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence."

---

[15] The question of whether a variance occurred on these facts is admittedly a close call.  On the one hand, the government alleged that Anthony and Shelby maintained the entire property for the purposes of manufacturing, distributing, and using methamphetamine.  Evidence that Christopher's house contained contraband is arguably within the scope of the indictment.  However, no evidence was introduced that Anthony knowingly maintained or had any connection to Christopher's residence.  Thus, introducing evidence that Christopher may have been manufacturing methamphetamine at his home when the indictment states only that Anthony and Shelby were involved in manufacturing and distributing the drug arguably constitutes a simple variance.

The government argues that evidence found in Christopher's home was relevant to Count Eight. Its theory of the case was that Anthony and Shelby maintained the entire property for their illegal purposes. Thus, it contends that anything found on the property was relevant to that charge. However, when the place allegedly maintained for manufacturing operations is a residence, the defendant must have a "substantial connection" to the home, as opposed to simply being a "casual visitor." Verners, 53 F.3d at 296.

Had the government presented evidence that Anthony had any connection to Christopher's house, the evidence found there may have been relevant to whether Anthony had a sufficient connection to the premises. However, such evidence simply was not provided at trial. Christopher's home was consistently treated as a separate residence by law enforcement authorities. The agent conducting the search of Christopher's home found nothing tying the premises to Anthony, no witness testified that Anthony ever conducted operations at Christopher's home, and there was no testimony establishing that Christopher was part of the larger conspiracy. Moreover, the government's decision to search Christopher's house on only one of the three occasions it raided the property demonstrates that it believed Christopher's residence was at most tangential to the methamphetamine operation. We hold that evidence found in an entirely unrelated residence is irrelevant to whether Anthony maintained a manufacturing

and distribution operation, and accordingly conclude that the district court erred in admitting such evidence against Anthony during the trial.[16]

Nevertheless, this error does not lead to reversal of Anthony's conviction because it did not affect his substantial rights. See Fed. R. Evid. 103(a). An error affects a defendant's substantial right when it has a "substantial influence" on the outcome of the trial or creates a "grave doubt" as to whether it had such effect. United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir.1990) (en banc) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). We entertain no such doubt; as noted above, overwhelming evidence of Anthony's guilt exists as to Count Eight. Thus, we conclude the district court's error in admitting this evidence was harmless.

### III

We review the legality of an appellant's sentence de novo. United States v. Price, 75 F.3d 1440, 1446 (10th Cir. 1996). Anthony was sentenced in June 2004, before the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005), or its predecessor, Blakely v. Washington, 542 U.S. 296 (2004). He argues that his sentence is invalid under Booker because the district court relied on judge-

---

[16] To the extent the district court concluded the evidence was admissible as to Shelby, but not admissible as to Anthony, it should have issued a limiting instruction to cure the inherent prejudice accompanying admission of evidence in joint trials. See United States v. Rogers, 925 F.2d 1285, 1288 (10th Cir. 1991).

found facts – the drug quantity attributable to him – to mandatorily enhance his sentence under the Guidelines.

In Booker, the Supreme Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 543 U.S. at 244. In United States v. Gonzalez-Huerta, 403 F.3d 727 (2005) (en banc), we identified two potential errors arising from a court's pre-Booker sentencing of a defendant. Non-constitutional Booker error occurs if the court "appl[ies] the Guidelines in a mandatory fashion . . . even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon a prior conviction." 403 F.3d at 731-32. Constitutional Booker error occurs when the court "rel[ies] upon judge-found facts . . . to enhance a defendant's sentence mandatorily." Id. at 731. If we conclude that a Booker error occurred, the government bears the burden of proving the error was harmless. United States v. Waldroop, 431 F.3d 736, 743 (10th Cir. 2005).

As to the claim of constitutional Booker error, the district court found that 14,974 kilograms of marijuana were attributable to Anthony based on a preponderance of the evidence standard, and relied on that finding to mandatorily increase his sentence under the Guidelines. Anthony did not admit to this

quantity, this amount was not charged in the indictment, and the jury made no finding as to the drug quantity. Thus, constitutional Booker error occurred.

However, this error is harmless if it did not affect the substantial rights of the accused. United States v. Lang, 405 F.3d 1060, 1064 (10th Cir. 2005). A defendant's substantial rights are affected if "a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence." United States v. Dazey, 403 F.3d 1147, 1175 (10th Cir. 2005). When overwhelming evidence is presented at the trial supporting the judge-found facts, taking into account the inferences raised by the jury's verdict, the error is harmless. See United States v. Riccardi, 405 F.3d 852, 875-76 (10th Cir. 2005).

The government has sufficiently proven that there is overwhelming evidence in the record to support the drug quantity determination found by the district court, which corresponded to a base offense level of 36. The PSR attributed 14,974 kilograms of marijuana to Anthony, which included: (1) 28.3 grams of methamphetamine mixture and 38.3 grams of pseudoephedrine, both of which were recovered from his home during the July 12, 2002 search, equivalent to 439.6 kilograms of marijuana, (2) 8.2 grams of pseudoephedrine and 1.3 grams of pure methamphetamine seized from Christopher's home during the December

11, 2002 search, equivalent to 108 kilograms of marijuana,[17] (3) 36.3 grams of pseudoephedrine, 66.3 grams of pure methamphetamine, and 7.5 grams of pure amphetamine seized during the July 18, 2003 search, equivalent to 1,839 kilograms of marijuana, and (4) 453.6 grams of methamphetamine mixture based on Hanna's testimony that he purchased one pound from Anthony and Shelby, 170.1 grams of methamphetamine mixture based on Landherr's testimony that she purchased one ounce on six occasions, and 5.67 kilograms of methamphetamine mixture based on Brown's testimony, which equate to a combined marijuana equivalent of 12,587.4 kilograms. During sentencing, the district court found that "the probation officer relied on the most conservative estimates and testimony in favor of the defendant when determining the amount of drugs involved."

Anthony argues the findings are not supported in the record because Hanna, Landherr, and Brown – whose testimony regarding Anthony's activities established the vast majority of the drug quantity finding – were inherently unreliable. Thus, he contends their testimony would not have established beyond

---

[17] Drugs found in Christopher's house appear to have been attributed to Anthony in calculating his drug quantity amount. Nonetheless, inclusion of that amount did not affect Anthony's base offense level. See U.S.S.G. § 2D1.1(c)(2). Under § 2D1.1(c)(2), his base offense level was 36 based on a finding that he was responsible for 14,974 kilograms of marijuana. He correctly points out that 108 kilograms of that amount related to drugs recovered from Christopher's residence, and thus should have been excluded. The base offense level for a drug quantity finding of 14,866 kilograms of marijuana – which excludes this amount – is also 36. Therefore, this error did not affect his substantial rights.

a reasonable doubt the drug quantity attributable to him. He is correct that these witnesses admitted to using drugs during the time in question, and further admitted that they were testifying pursuant to an agreement with the government. However, there is no prohibition in this circuit on using co-conspirator statements and the testimony of former addicts to establish the drug quantity amount, even when those individuals are cooperating with the government. See Cook, 949 F.2d at 296 (holding testimony of co-defendant was sufficiently reliable to establish drug quantity because the witness was "quite familiar with [the defendant's] drug trafficking").[18] Moreover, these same witnesses presented the crucial testimony used to convict Anthony. We can infer from the jury's verdict that it expressly found these witnesses credible. In addition, the government correctly notes that Hanna, Landherr, and Brown were reliable because their testimony was consistent and corroborated by the physical evidence found during the searches. Thus, the constitutional Booker error was harmless.[19]

_____

[18] But see United States v. Miele, 989 F.2d 659, 667 (3d Cir. 1993) ("Because of the questionable reliability of an addict-informant, we think it is crucial that a district court receive with caution and scrutinize with care drug quantity or other precise information provided by such a witness before basing a sentencing determination on that information."); United States v. Simmons, 964 F.2d 763, 776 (8th Cir. 1992) (rejecting drug quantity estimates by addict-informant); United States v. Robison, 904 F.2d 365, 371-72 (6th Cir. 1990) (same).

[19] Anthony also challenges the drug quantity finding made by the district court on the same grounds – that it was based on unreliable witness testimony. Because there was overwhelming evidence to support the district court's drug

(continued...)

As for the non-constitutional <u>Booker</u> error, the government concedes that the district court committed non-constitutional <u>Booker</u> error by applying the Guidelines mandatorily. Nevertheless, we conclude that this error was also harmless. Non-constitutional <u>Booker</u> error is harmless unless there is "a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range." <u>United States v. Clifton</u>, 406 F.3d 1173, 1181 (10th Cir. 2005). Once again, the government bears the burden of proof to show that the non-constitutional <u>Booker</u> error was harmless. <u>Waldroop</u>, 431 F.3d at 743.

Generally, non-constitutional <u>Booker</u> may have affected a defendant's substantial rights if there is "evidence of (1) a substantial disconnect between the § 3553(a) factors and his sentence, and (2) the district court's expressed dissatisfaction with the mandatory Guidelines sentence in his case." <u>Id.</u> The government has sufficiently proven that there is no reasonable probability the district court would have imposed a sentence outside the Guidelines range. There is no evidence in the record that the district court expressed any dissatisfaction with Anthony's sentence. Moreover, there is no indication that any of the §

_____

[19](...continued)
quantity finding, and corresponding base offense level determination, we reject this claim.

- 27 -

3553(a) factors would have led the district court to impose a different sentence. In fact, the district court stated that it considered the "nature and circumstances" of the defendant in formulating the appropriate sentence. Moreover, Anthony has not identified any § 3553(a) factor that the district court may have considered in formulating a different sentence. Accordingly, the non-constitutional Booker error is harmless.

## IV

## A

The government concedes that the district court committed constitutional Booker error in sentencing Shelby by relying on judge-found facts regarding the drug quantity to mandatorily increase his sentence. See United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir. 2005). Unlike the position it has taken with respect to Anthony, the government concedes that this error was not harmless, because the district court sentenced Shelby to the low end of the Guidelines range. See United States v. Labastida-Segura, 396 F.3d 1140, 1143 (10th Cir. 2005) (holding that when the district court sentences a defendant at the bottom of the Guidelines range it "places us in the zone of speculation and conjecture – we simply do not know what the district court would have done after hearing the parties"). Accordingly, as conceded, the district court committed constitutional Booker error in sentencing Shelby, and this error was not harmless.

## B

Shelby also challenges the district court's drug quantity finding on the ground that it failed to make particularized findings as to (1) the scope of the criminal activity Shelby agreed to undertake regarding the conspiracy, and (2) the total amount of drugs involved that were foreseeable to him. United States v. Green, 175 F.3d 822, 837 (10th Cir. 1999) (holding that the district court must make these two particularized findings when determining the proper amount of drugs to attribute to a defendant involved in a conspiracy). We agree. Although the district court adopted the findings contained in the PSR, the PSR did not make particularized determinations with respect to either of these points. We do not know whether, upon close examination of the evidence, the district court might agree with Shelby that his knowledge of Anthony's operations was limited and decrease his sentence accordingly. Thus, upon remand, the district court should address these questions. See United States v. Melton, 131 F.3d 1400, 1404 (10th Cir. 1997) (remanding for resentencing when the district court failed to make the necessary particularized findings regarding the scope of the defendant's participation in the conspiracy); see also United States v. Tucker, 90 F.3d 1135, 1145 (6th Cir. 1996) (same).

**V**

Accordingly, we **AFFIRM** Anthony's conviction and sentence, and **REVERSE** Shelby's sentence and **REMAND** for resentencing.