**F I L E D**

**UNITED STATES COURT OF APPEALS**

**May 30, 2007**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ADRIAN MACIAS CASTRO,

      Defendant-Appellant.

No. 05-6398
(D.C. No. 04-CR-179-6-R)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **HOLLOWAY**, and **GORSUCH**, Circuit Judges.

Following a trial in which he was found guilty of 11 narcotics felonies, Adrian Macias Castro appeals to us arguing that the district court erroneously failed to suppress incriminating evidence, legally insufficient evidence exists to sustain his conviction, and the district court engaged in improper fact finding during sentencing. Constrained to conclude that Mr. Castro lacks standing to challenge the search at issue, we affirm the district court's denial of Mr. Castro's suppression motion and affirm as well on the remaining issues before us.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Oklahoma City gang member Jason "Joker" Lujan agreed to cooperate with authorities after his arrest in 2003, volunteering that several members of a Hispanic gang from California, later identified as the Compton Varrio Tortilla Flats, including "Boxer," "Lalo," and Mr. Lujan's sister-in-law, Jennifer Lujan, had moved to Oklahoma City to deal large quantities of methamphetamine. Specifically, Mr. Lujan explained that Boxer, later identified as Dennis Emerson Gonzalez, had already left Oklahoma City but still ran the operation; Lalo, later identified as Eduardo Verduzco, delivered drugs to Oklahoma City at Mr. Gonzalez's direction; Ms. Lujan distributed the drugs in Oklahoma City; and Mr. Gonzalez's girlfriend, "Mousey," stored the drugs in her apartment.

In cooperation with the police, Mr. Lujan called his sister-in-law to arrange for a purchase of methamphetamine. Ms. Lujan agreed to the deal and traveled to Mr. Lujan's home to complete the transaction. On her way there, she was followed by police, stopped for a traffic violation, and then arrested for failing to produce a valid driver's license. Officers searching her vehicle found $1,220.25 in cash, 12 grams of methamphetamine, a drug ledger, and two cell phones. Purportedly because they feared that fellow members of the conspiracy would grow suspicious when Ms. Lujan didn't arrive at Mr. Lujan's home and might proceed to destroy evidence, the police rushed to Ms. Lujan's apartment. There, they knocked on the door and received no response, though they heard several people moving about inside the residence. Officers proceeded to kick down the

- 2 -

door and place the occupants they found inside the apartment in the back of police cruisers to "secure" the scene. They then sought and obtained a search warrant, subsequently finding and seizing a substantial quantity of methamphetamine from Ms. Lujan's apartment and other sources related to the gang's operations. Further investigation by the police led to the discovery of a loaded pistol which was eventually tied to Mr. Castro.

A federal grand jury eventually charged Mr. Castro and eleven others with 79 felony counts related to the drug ring. With respect to Mr. Castro, the grand jury returned 11 charges ranging from participating in a drug conspiracy to being a felon unlawfully in possession of a firearm to engaging in a money laundering scheme. Mr. Castro moved to suppress the evidence obtained from Ms. Lujan's apartment but, after an evidentiary hearing, the district court denied his motion, finding that Mr. Castro had no reasonable expectation of privacy in Ms. Lujan's residence. D.E. 207 (Order at 2). Eight of the eleven defendants indicted as part of the drug ring eventually pled guilty and cooperated with the government. Mr. Castro, along with two associates, elected to proceed to trial. After two weeks of proceedings, the jury returned guilty verdicts against Mr. Castro on all of the counts with which he was charged.

In assessing Mr. Castro's appeal of the district court's disposition of his motion to suppress, we review the evidence in the light most favorable to the United States, accepting unless clearly erroneous the district court's factual

findings and reviewing *de novo* its Fourth Amendment reasonableness determination. *United States v. Angevine*, 281 F.3d 1130, 1133 (10th Cir. 2002) (internal quotation omitted). Mr. Castro bears the burden of establishing a Fourth Amendment violation. *See Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978).

Even viewing the facts in the light most favorable to the government, we remain troubled by Mr. Castro's allegation that "the exigency was created by the police" who followed and stopped Ms. Lujan for a traffic infraction, then bootstrapped that stop into a felt need to raid and secure her apartment before others in the gang might get wind of her detention. Law enforcement may not, consistent with our constitutional charter, create their own exigencies to avoid the necessity of a warrant to enter a person's home. *See United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987) (rejecting government's argument that exigent circumstances justified a warrantless search where "the only immediate danger that existed was created by the officers themselves"). Our difficulty in affording Mr. Castro relief in this case is that the Supreme Court has also repeatedly instructed that Fourth Amendment rights are personal ones. That is to say, in order to establish standing to challenge a search as a Fourth Amendment violation, a "defendant must prove 'a legitimate expectation of privacy' in the place searched," *Angevine*, 281 F.3d at 1134 (quoting *Rakas*, 439 U.S. at 143), something which requires a showing of both a "'subjective expectation of privacy in the area searched,'" and a showing that this expectation is "'one that society is

prepared to recognize as reasonable.'" *Id.* (quoting *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998)). Thus, Ms. Lujan's right to contest the validity of the police action with respect to the search of her own apartment does not necessarily confer standing to Mr. Castro to do the same.

Mr. Castro argues for standing by stressing that he was Ms. Lujan's former boyfriend and that mail addressed to him was found in the apartment during the raid. Mr. Castro, however, neglects to point us to other highly pertinent facts in the record that augur against standing. The district court expressly found that Mr. Castro shot a gun at Ms. Lujan three months prior to the challenged search and that, after the shooting, Mr. Castro moved out of the apartment, away from Oklahoma City, and back to California. D.E. 207 (Order at 2.) The district court also noted that only Ms. Lujan appeared as the lessee on the apartment's lease. *Id.* Finally, the government produced evidence that Mr. Castro was not at the residence at the time of its search, Supp. Hr'g Tr. at 22; that Mr. Castro had no clothing at the residence, *id.* at 24; and that Mr. Castro did not pay any bills at the residence, *id.* Given these additional facts, we are unable to say the district court erred in its factual finding that Mr. Castro was sent packing after assaulting his girlfriend and thus had no objectively reasonable expectation of privacy remaining in the apartment three months later, at the time of the raid. Indeed, courts have repeatedly held that individuals in analogous circumstances lack Fourth Amendment standing. *Compare, e.g.*, *Bonds v. Cox*, 20 F.3d 697, 701 (6th

Cir. 1994) (homeowner "not occupying the house during the relevant time period," who allowed her son to live there while she was ill, had no expectation of privacy in the house); *with Trask v. Franco*, 446 F.3d 1036, 1042 (10th Cir. 2006) ("[Both individuals] were living in the residence when the nonconsensual search occurred and had a reasonable expectation of privacy in their home.").[1]

Mr. Castro's sufficiency of the evidence challenge is no more availing. In reviewing such challenges we are obliged to view the evidence and all reasonable inferences that can be derived from that evidence in the light most favorable to the government, *United States v. Ramirez*, 479 F.3d 1229, 1249 (10th Cir. 2007) (internal quotation omitted), and we have explained that this "'restrictive standard of review for a sufficiency of the evidence question provides us with very little leeway.'" *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007) (quoting *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992)).

Mr. Castro does not point us to any specific element on which he contends evidence was lacking, arguing rather more generically that the government's drug conspiracy case was based on "rather meager circumstantial inferences." Aplt. Br. at 19. But our precedent teaches that the government may meet its burden on

---

[1] Mr. Castro replies by commenting that "[t]here is no evidence that any other person had moved into his bedroom nor taken his place in the relationship with Jennifer Lujan." Aplt. Br. at 10. But it is hardly the case that a former boyfriend or spouse automatically retains a legitimate expectation of privacy in the home of their "ex" until and unless someone "takes his place in the relationship."

the elements of each crime of conviction by either direct *or* circumstantial evidence. *Sells*, 477 F.3d at 1235. And in this case the government offered significant direct *and* circumstantial evidence of Mr. Castro's participation in the drug ring. By way of example only, Ms. Lujan personally testified to Mr. Castro's involvement in the drug conspiracy, explaining, among other things, that he arrived by bus from California in 2002 carrying a duffel bag, which he delivered to Mr. Gonzalez. After Mr. Castro, Mr. Gonzalez, and another co-conspirator entered a bedroom with the bag, methamphetamine was brought out to Ms. Lujan. Trial Tr. at 562-63; *see also id.* at 784, 834. Ms. Lujan also testified that Mr. Castro drove a Chevrolet Blazer carrying approximately two pounds of methamphetamine from California to Oklahoma in July or August of 2003. Trial Tr. at 613-15. We have found evidence along these lines sufficient in other cases to sustain convictions like Mr. Castro's. *See, e.g., United States v. Small*, 423 F.3d 1164, 1183-85 (10th Cir. 2005) (circumstantial evidence linking defendants to each other sufficient for conviction of involvement in drug conspiracy); *United States v. Lauder*, 409 F.3d 1254, 1259-60 (10th Cir. 2005) (circumstantial evidence linking defendant to drugs sufficient for conviction of possession with intent to distribute); *United States v. Ramirez*, 348 F.3d 1175, 1181-82 (10th Cir.

2003) (sufficient evidence to support conviction for conspiracy to possess with intent to distribute).[2]

On the firearm charge, likewise, Ms. Lujan testified that on one occasion Mr. Castro pointed a gun at her, pointed it at her car, and then started shooting at the car; this is sufficient for a jury to infer Mr. Castro's knowing possession of a firearm and thus a violation of the statutory prohibition against felons possessing firearms, particularly given Mr. Castro's stipulation to a prior felony conviction and the government's evidence that the firearm had been made in Massachusetts and found in Oklahoma, thereby affording an interstate nexus. *United States v. Gorman*, 312 F.3d 1159, 1163-64 (10th Cir. 2002) ("In a conviction of possession of a firearm by a convicted felon pursuant to 18 U.S.C. § 922(g)(1), the government must prove beyond a reasonable doubt: (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce." (internal quotation omitted)).

With respect to the money laundering conspiracy charges, Mr. Castro argues that the government never produced evidence of an actual agreement between him and other members of the gang. But Mr. Castro's argument fails to

---

[2] Mr. Castro also argues that Ms. Lujan never actually saw Mr. Castro with drugs. That assertion is incorrect. Ms. Lujan testified, for example, that she saw Mr. Castro and another co-conspirator take the back seat out of the Chevrolet Blazer, revealing methamphetamine hidden in the seat. Trial Tr. at 613-15.

recognize our controlling precedent providing that "an agreement constituting a conspiracy may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Torres*, 53 F.3d 1129, 1134 (10th Cir. 1995) (internal quotation and alteration omitted). The government presented evidence that Mr. Castro did not report any income for the tax year 2003. It offered evidence that Mr. Castro accompanied Ms. Lujan on at least one occasion when she wired drug money through Western Union. It produced evidence that Mr. Castro himself drove drug money from Oklahoma to California. And it supplied evidence that, on individual wire transfers, Mr. Castro used different telephone numbers and listed different residential addresses, as well as testimony from an Internal Revenue Service agent that the wire transfers by members of the conspiracy, including Mr. Castro, showed a pattern of money sent from Oklahoma to California and Florida using false names and false addresses. Such evidence, together with the evidence of Mr. Castro's involvement in the gang's drug operations, was sufficient under our case law for a jury to find Mr. Castro guilty beyond a reasonable doubt of the charged money laundering offenses. *See Torres*, 53 F.3d at 1136-37; *United States v. Garcia-Emanual*, 14 F.3d 1469, 1473, 1476-78 (10th Cir. 1994); *United States v. Dimeck*, 24 F.3d 1239, 1242-43 (10th Cir. 1994).

At the conclusion of Mr. Castro's trial, the jury indicated on a special verdict form that the amount of methamphetamine attributable to that conspiracy was 500 grams "or more." Later, at sentencing, the district court found, by a preponderance of the evidence, that Mr. Castro was personally involved with, and for sentencing purposes responsible for, an amount of methamphetamine in excess of 1.5 kilograms. Sent. Hr'g Tr. at 13.[3] Mr. Castro argues that the district court erred when it engaged in fact finding, independent of the jury, to ascertain the precise quantity of drugs for which he bore responsibility. This argument, however, runs afoul of our precedent expressly permitting district courts to make factual findings of drug quantities in exactly these circumstances. *See*, *e.g.*, *United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007) ("Because the post-*Booker* Guidelines are discretionary, a district court may continue to find facts, including drug quantity, by a preponderance of the evidence."); *see also United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005) (district court may make finding of drug quantity by preponderance of evidence for purposes of

---

[3] In doing so, the court noted that Mr. Castro might reasonably be held accountable for *all* the drugs flowing through the conspiracy given his intimate involvement in the scheme, though it eventually chose to follow a more modest course. Sent. Hr'g Tr. at 13.

determining guidelines range even where jury found lesser amount).  *Affirmed.*


ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge